IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 21, 2010 Session

**IN RE KERI C.**

**STEPHEN AND DUSTIE BELCHER v. CHRISTY C.**

An Appeal from the Chancery Court for Jefferson County
No. 08-013      Telford E. Forgety, Chancellor

———————————

No. E2010-00381-COA-R3-PT  - FILED NOVEMBER  22, 2010

———————————

This is a termination of parental rights and adoption case.  The mother of the child tested positive for cocaine when the child was born, and DCS removed the child from the mother's custody and developed a safety plan for the mother.  The child was eventually placed in the custody of the petitioners, who are the mother's cousin and her husband.  During the time period at issue, the mother's visitation with the child consisted primarily of attending family gatherings and  visiting with the child at these gatherings.  She paid no child support.  After the mother went to the petitioners' home to say that she intended to seek custody of the child, the petitioners filed this petition for termination of the mother's parental rights and for adoption of the child.  After a trial, the trial court terminated the mother's parental rights on grounds of abandonment by failure to support and failure to visit.  The mother now appeals. We affirm the trial court's finding of abandonment for failure to support and for willful failure to engage in more than token visitation with the child during the four-month time period preceding the filing of the termination petition, and affirm the termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Scott Justice, Jefferson City, Tennessee, for the Respondent/Appellant, Christy C.

Mitzi L. Sweet, Morristown, Tennessee, for the Petitioners/Appellees, Stephen and Dustie Belcher.

OPINION

## FACTS AND PROCEEDINGS BELOW

On September 25, 2005, Respondent/Appellant Christy C. ("Mother") gave birth to the child involved in this action, Keri C. ("Keri" or "the child"), at Forth Sanders Hospital in Knoxville, Tennessee. The child was born prematurely, at twenty-nine weeks gestation. At the time Keri was born, Mother tested positive for cocaine. Due to Keri's premature birth and Mother's positive cocaine test, upon birth, the child was transferred to the neonatal intensive care unit at East Tennessee Children's Hospital. She was treated there for about seven weeks.

On November 15, 2005, in light of Mother's positive drug test, the Tennessee Department of Children's Services ("DCS") filed a petition for dependency and neglect in the Jefferson County Juvenile Court. In the petition, DCS averred that, although Mother denied any drug use at the time, she nevertheless agreed to allow Keri to live with Keri's maternal great grandmother, Katie S. ("Great Grandmother"). At the time, Great Grandmother already had custody of Mother's older child, Keri's one-year-old sister Mariah.[1] DCS asserted that Great Grandmother had agreed to allow Mother to live with her and both children while Mother completed the DCS safety plan. DCS's request that the trial court allow Keri to "stay in the home with the Mother and maternal great grandmother" was expressly contingent on Mother's cooperation and "a very stringent Safety Plan." The proposed safety plan by DCS required Mother to: (1) accept and cooperate with all contract services provided by DCS, such as counseling; (2) attend counseling if recommended by DCS; (3) complete an alcohol and drug ("A&D") assessment and follow all recommendations; (4) complete parenting classes; (5) have no unsupervised contact with the child until after completing the A&D assessment and recommended treatment and parenting classes; (6) execute a Power of Attorney for Child Care to enable Great-Grandmother to secure medical care for the child; and (7) that any and all government assistance money received by Mother for the child would be spent on the child.

On the day the DCS petition was filed, the juvenile court entered an *ex parte* order removing Keri from Mother's custody and officially transferring custody to Great Grandmother. On November 18, apparently after waiver of a preliminary hearing, the juvenile court entered an order finding probable cause to believe that Keri was dependent and neglected, and requiring

---

[1]The DCS petition states that Mother gave birth to Mariah in February 2004, and that both Mother and Mariah tested positive for cocaine when she was born. Consequently, at birth, Great Grandmother was awarded custody of Mariah.

Mother to follow the safety plan proposed by DCS. The appellate record contains no indication of a subsequent adjudicatory hearing or order.

After a few months, Mother again tested positive for cocaine. As a result, Mother was removed from the home of Great Grandmother. Sometime thereafter, Mother moved in with her own mother, Keri's maternal grandmother, Wanda S. ("Grandmother"). After a hearing on March 14, 2006, the juvenile court entered an order transferring temporary custody of Keri to Great Grandmother, based on Mother's noncompliance with the safety plan. The order stated that Mother had not completed drug treatment, and that the parties agreed that Keri's best interest was served by the child remaining in the Great Grandmother's custody while Mother completed the safety plan requirements.

Meanwhile, Great Grandmother suffered a leg injury. This left her unable to care for Mother's daughters, Mariah and Keri, both in her custody. Consequently, in January 2006, Grandmother accepted custody of Mariah, and the Petitioners/Appellees Stephen and Dustie Belcher ("the Belchers") volunteered to take Keri into their own home. Dustie Belcher is Mother's first cousin, and Great Grandmother is Dustie Belcher's grandmother. Thus, Keri was able to remain within Mother's family without further involvement of DCS. Not long after that, due to complications related to obtaining continuing medical care for Keri, Great Grandmother and the Belchers agreed to make official the transfer of custody of Keri to the Belchers. Accordingly, on February 6, 2007, the juvenile court entered a consent order transferring temporary custody of Keri from Great Grandmother to the Belchers. This order provided that Mother was to have supervised visitation with the child under the supervision of the Belchers, or their designee, as agreed by the parties. The order stated: "the issue of child support is reserved at this time." Thus, the Belchers have had continuous custody of Keri since January 2006.

When Keri was born, an application was filed for supplemental social security ("SSI") benefits for the child because of her premature birth and Mother's positive drug test. The child received about $500 per month in SSI benefits from her birth. These benefits were paid to the child's caregivers, *i.e.*, first to Great Grandmother and then to the Belchers.

Prior to the filing of the termination petition, the record indicates that Mother did not have long-term employment, and in fact she had trouble keeping any job. In November 2007, Mother was employed at Cherokee Lumber for a few weeks. Mother earned between $500 and $1,000 at Cherokee Lumber. At some point while she was employed by Cherokee Lumber, Mother enrolled in an out-patient drug rehabilitation program at New Hope Recovery. This program lasted until the end of January 2008.

During the four-month time period prior to the filing of the termination petition, *i.e.*, September 24, 2007 through January 24, 2008, Mother saw Keri four or five times. In September 2007, Mother attended Keri's second birthday party, at the Belchers' invitation, and brought presents to the child. During the birthday party, Mother spent about thirty minutes trying to interact with Keri, with little success. In November 2007, Mother attended a family Thanksgiving dinner at her uncle's house, which the Belchers and Keri also attended. Once again, Mother spent about thirty minutes trying to engage with Keri, but the child was not interested. In December 2007, Mother attended a family Christmas party at her aunt's house, and the Belchers and Keri also attended. On that occasion, Mother brought Christmas gifts for the child.

In January 2008, Mother and a friend went, unannounced, to the home of the Belchers. During the visit, Mother told Mrs. Belcher that she was a few days away from completing her drug rehabilitation program. Mother told Mrs. Belcher that she planned to complete the DCS safety plan and ask the court to return her child to her custody. Mother asked Mrs. Belcher whether the Belchers would challenge her on the issue of custody of Keri. Mrs. Belcher responded that they would object to custody of Keri being returned to Mother.

A few days later, on January 24, 2008, the Belchers filed the instant petition to terminate Mother's parental rights and to adopt Keri.[2] As grounds for termination, the Belchers alleged that Mother had abandoned the child by failing to visit and failing to support the child during the four months preceding the filing of the termination petition, and that conditions that led to the removal of the child from Mother's custody still persisted and were not likely to soon be remedied. The petition asserted that terminating Mother's parental rights would be in Keri's best interest.[3]

On January 28, 2008, Mother completed the requirements of her out-patient drug rehabilitation program. The next day, she began a four-day parenting course, which she completed on February 19, 2008.

The trial court decided to bifurcate the trial on the Belchers' petition. The initial proceeding would be on grounds for termination of Mother's parental rights. If needed, a second hearing on the child's best interest would be conducted.

---

[2]The Belchers' petition also sought to terminate the parental rights of Keri's putative father. He failed to answer or respond in any way, and a default judgment was entered against him. The Belchers also sought to terminate the rights of any unknown father by publication. Those rights were terminated by default as well. Thus, the parental rights of any putative father of the minor child have been terminated and are not at issue in this appeal.

[3]On February 11, 2008, the trial court appointed a guardian ad litem for the child.

On November 29, 2009, the trial court conducted the trial on the grounds for termination. By this time, the Belchers had decided not to pursue termination of Mother's parental rights based on the ground of persistent conditions. Therefore, the trial proceeded only on the grounds of abandonment by failure to visit and failure to support the child within the pertinent four-month time period. T.C.A. § 36-1-113(g)(1) (Supp. 2009); *see* T.C.A. § 36-1-102(1)(A)(i) (Supp. 2009). Consequently, the trial testimony focused on Mother's visits with Keri and her financial support of the child during that time.[4]

The Belchers testified at trial. Mr. Belcher testified that Mother had always been aware that she was welcome to visit Keri at their home: "We told [Mother] that our door was always open, she was welcome anytime ever to come to our house. We told her to call anytime." Mr. Belcher said that he and Mrs. Belcher "tried to encourage her. We tried to make her feel comfortable when she come [sic] . . . to our house." At times, he said they invited Mother over for Sunday dinner, and to see Keri and Mariah. For Mother to attend a Sunday dinner, however, "was a rare occasion."

Mr. Belcher testified about Mother's visits with the child during the latter part of 2007. He said that Mother attended Keri's birthday party in September 2007. Mr. Belcher explained that the occasion was "a birthday party that we were having for the whole family. It was not a visitation for [Mother]." He said that Mother brought gifts for Keri and tried to play with her, but Keri "wouldn't have much to do with [Mother] because she didn't know [Mother]." Consequently, he said, Mother did not spend much time with Keri at the party. Mr. Belcher testified that he had no communication with Mother whatsoever in October 2007.

Mr. Belcher testified that the only occasions on which he communicated with Mother in November and December 2007 were when he saw her at the family Thanksgiving and Christmas celebrations. He explained that his wife's "family always gets together Thanksgiving and Christmas" and that "everybody knows to meet" at his wife's uncle's home. On Thanksgiving 2007, Mr. Belcher said, Mother "just happened to show up. She didn't always show up. You didn't know if she was going to be there or not." On this occasion, he stated, Mother again spent "[b]etween 20 and 30 minutes" trying to play with Keri, but the child was more interested in playing with the other children who were there. The Christmas family celebration was similar, Mr. Belcher stated, in that Mother spent about 20 or 30 minutes with Keri, but the child was more interested in playing with the other children.

---

[4]Testimony regarding events that occurred prior to the pertinent four-month time period was largely excluded by the trial court as irrelevant.

Mr. Belcher testified that, from time to time, Mother called their home to speak to Keri. During these telephone calls, he said, Mother never asked to schedule visitation with the child. Mr. Belcher estimated that Mother's telephone calls occurred "every three weeks or whatever." In the past, Mr. Belcher said, they had permitted Keri to spend the night at Grandmother's house while Mother was there. However, the Belchers discontinued this after Mother was arrested for possession of illegal drugs in March 2009. During the four-month time period preceding the filing of their petition, Mr. Belcher stated, Keri did not visit Grandmother's house at all. Keri's past visits with Grandmother, he indicated, were arranged by Grandmother primarily to enable Keri to spend time with Grandmother and Mariah, not so that Keri could spend time with Mother, and Mother was not involved in making the arrangements or attending the visits at Grandmother's house.

Mr. Belcher said that, during the pertinent four-month period, he and his wife did not receive any financial support from Mother. After the termination petition was filed, Mother gave the Belchers $40, and that was the total support she had provided for Keri during the entire time the Belchers had had custody of Keri. When questioned about whether he had ever asked Mother for child support, Mr. Belcher replied, "No, sir, I did not, because it's not my place to ask her." He was of the view that it was up to Mother to be forthcoming with the payments, adding that Mother knew she had an obligation to support Keri. Mr. Belcher said, "I can't make her." He acknowledged that the order transferring custody of Keri reserved the issue of child support, and that there was no court order requiring Mother to pay child support.

Mrs. Belcher also testified at trial. She recalled Keri's September 2007 birthday party and emphasized that Mother was "[j]ust invited to the party, [it was] not a visit." At the party, Mrs. Belcher said, Mother did not spend a great deal of time with Keri because the child did not know Mother and wanted to play with her friends. To Keri, Mrs. Belcher claimed, Mother was "just a casual person coming to the party." Mrs. Belcher recalled that Mother brought some clothes and toys as gifts for Keri. Mrs. Belcher testified that they did not see Mother in October 2007, and that the family stayed in on Halloween because Keri was too young to trick-or-treat.

Mrs. Belcher recalled the November 2007 family Thanksgiving celebration. Before the gathering, she said, she did not know that Mother would be there. Despite the fact that Mother spent about twenty to thirty minutes with Keri at the Thanksgiving gathering, Mrs. Belcher did not consider this to be a visit between Mother and Keri. In the same way, Mrs. Belcher testified, she did not know in advance that Mother would attend the December 2007 family Christmas celebration. Mrs. Belcher estimated that Mother spent a total of thirty to forty-five minutes with Keri on that occasion, and she recalled that Mother brought Christmas gifts for the child, such as clothes, a story book, a tooth fairy kit, and the like.

-6-

After the Christmas family event, Grandmother took Keri home with her for a couple of hours. Mrs. Belcher said that she "trusted [Keri] with [Grandmother]."[5]

In January 2008, Mrs. Belcher testified, Mother arrived unannounced with a friend at her house. During that visit, Mother told Mrs. Belcher that she had been rehabilitated and that she planned to seek custody of her children. If she did so, Mother wanted to know if Mrs. Belcher would challenge her attempt to seek custody of Keri. Mrs. Belcher responded that she would. On this occasion, Mrs. Belcher stated, Mother played with Keri for a few minutes when she arrived, but that was the extent of the visit.

Like Mr. Belcher, Mrs. Belcher testified that, over the years the Belchers had had custody of Keri, Grandmother would from time to time invite Keri over to play with Mariah and to spend the night. Mrs. Belcher said that she did not know whether Mother was present during these visits, but she suspected that she was not, based upon Grandmother's remarks. Mrs. Belcher said these visits were for Grandmother and Mariah, not for Mother. Mrs. Belcher reciprocated, sometimes having Mariah spend the day with her family and Keri so that the two sisters could maintain a relationship. Mrs. Belcher testified that, during the pertinent four-month period, Keri did not go to Grandmother's house to spend the night, although she may have visited Grandmother without spending the night.

Mrs. Belcher acknowledged that, during the pertinent time period, Mother called "once or twice" to talk to Keri, but Mother never requested a visit with Keri. Mrs. Belcher described the "talking" between Mother and her daughter as mainly just "jibber," because two-year old Keri did not yet talk very well. Mrs. Belcher stated that she never did anything to impede Mother's visitation with Keri; to the contrary, she welcomed Mother into their home to visit Keri, and even invited her to attend church with them at times. Mrs. Belcher said that Mother went with them to church "a couple of times," but this was apparently outside the pertinent time period. Mrs. Belcher felt that she had done what she could to help Mother bond with Keri.

Mrs. Belcher corroborated Mr. Belcher's testimony that Mother paid no support to the Belchers during the pertinent time period. Mrs. Belcher conceded that she had never asked Mother to pay child support, there was no court order requiring Mother to pay child support, and she never heard anyone tell Mother that she needed to pay child support. Nevertheless, Mrs. Belcher believed that Mother "knew that she had a responsibility for [Keri]." Mrs. Belcher said she did not ask Mother to pay support because she knew that Mother was not

[5]It is unclear whether Mother went home with Grandmother and the child. There was no testimony that Mother spent any time with the child when the child went to Grandmother's house on Christmas 2007.

-7-

working; at the same time, however, she knew that Mother was able to work. Mrs. Belcher acknowledged that the Belchers received an SSI check for the benefit of Keri every month.

Mother testified on her own behalf. In her testimony, Mother said that, at the time of trial, she was living with Grandmother, and had been living there for two years, including the relevant four-month time period.

Mother testified about her visits with Keri during the four-month time period prior to the filing of the termination petition. On Keri's birthday in September 2007, Mother stated, she attended her party and brought her gifts. She could not recall the exact gifts she brought, but said that they were clothes and toys. Mother was "not for sure" whether she had any other visits in September 2007. In October 2007, Mother testified, she went trick-or-treating with Keri and the rest of the family on Halloween. On cross-examination, Mother was presented with her September 2008 deposition testimony, in which she said that she could not remember whether she visited Keri in October 2007, and added that she was probably "still smoking pot" at the time. Despite her prior deposition testimony, Mother maintained at trial that she was positive that she spent time with Keri on Halloween in 2007.

As to November 2007, Mother was unsure whether she had any visitation with Keri other than on Thanksgiving. In December 2007, Mother recalled visiting with Keri at the family Christmas dinner, and said that she brought the child presents, consisting of toys and clothes.

In January 2008, Mother testified she visited Mrs. Belcher and Keri at the Belchers' home to discuss regaining custody of the child. She said that she explained to Mrs. Belcher that she had almost finished her outpatient drug rehabilitation program, and told her that she intended to ask the juvenile court for custody of her children. Mother testified that she "asked [Mrs. Belcher] if she was going to fight me. She said she didn't know, but then she said probably. So we had a conversation and then I left." Mother said that she also played with Keri that day, but said that she was only at the Belchers' home for about thirty to forty-five minutes.

Mother acknowledged that while the Belchers had had custody of Keri, she never had regular visits with the child, and she never called the Belchers to arrange a visit. Instead, she simply "showed up" at family holiday celebrations. Mother added, "that's my right to do that at my family gatherings." Although she did not ask the Belchers for visits, Mother noted that she called them periodically to check on Keri. She could not recall how many times she called during the pertinent time period. Mother admitted that the time she had spent with Keri "could not possibly have allowed [her] any reasonable opportunity to bond with her." She conceded that she had a car that enabled her to drive to the Belchers' home, and said that no

one prevented her from visiting the child. Ultimately, she said, her failure to visit Keri was her own choice.

Mother also admitted in her testimony that she paid no support to the Belchers during the pertinent four-month time period. She acknowledged that she had "a full and complete understanding" that she was obligated to support Keri financially and otherwise:

> Q. [Y]ou have a full and complete understanding . . . of parental obligations?
> A. Yes.
> Q. And you have a full and complete understanding that you are obligated to care for your children?
> A. Yes.
> Q. Would you agree with me . . . that caring for your children means providing shelter?
> A. Yes.
> Q. Clothes?
> A. Yes.
> Q. Money?
> A. Yes.
> Q. Would you agree that it means providing medical care?
> A. Yes.
> Q. And you agree with me when that baby is not in your custody, that didn't end your obligation to [Keri] financially, did it?
> A. No, it didn't.
> Q. And since her birth, even when she was with [Great Grandmother] and then [Keri] was with the Belchers . . ., you knew of your obligation to support her?
> A. Yes.

Mother noted that the Belchers received an SSI check in the amount of approximately $500 each month for Keri's care. However, Mother acknowledged that the SSI check did not come from her, and said that she understood that the SSI check did not discharge her duty to support Keri financially. Mother said that the only time she had paid support for Keri was in 2008, after the petition was filed, when she gave $40 to Grandmother.

Asked about her employment, Mother indicated that she had worked "off and on" during all of Keri's life. During the pertinent time period, Mother said, she was employed for a time at a Krystal's fast food restaurant and then at Cherokee Lumber. From her employment at Cherokee Lumber, Mother earned over $500. At the time of trial, Mother stated, she was

doing some work for a man who was disabled, cleaning his house and taking care of him personally. She did not indicate whether or how much she was paid for this work.

Asked why she never paid any money in support of Keri, Mother replied, "I didn't know I had to pay child support." Although she was generally aware of her obligation to support her own child, she said, her obligation to pay money to the Belchers on Keri's behalf "wasn't court ordered," the Belchers had never asked her to pay child support, and, in addition, she "figured [Keri's] welfare was pretty much taken care of with the [SSI] check." Mother asserted that, had she been court-ordered to do so, she would have paid child support. However, no one had ever told her that she needed to pay child support to the Belchers, and no one had indicated how much she was supposed to pay. That concluded Mother's testimony.

The Belchers called two police officers to testify about Mother's conduct after the petition was filed. One testified that he arrested Mother for possession of narcotics and marijuana in March 2009. The second testified that he arrested Mother for public intoxication in August 2009.

Mother called her mother, Grandmother, to testify on her behalf. Grandmother asserted that Mother had been living with her, but added that Mother had "been staying" at a friend's house during the week to help him out. In her testimony, Grandmother was unsure about Keri's visits with her during the pertinent time period and could not recall when or how many times Keri had visited her home. Grandmother's testimony did not include any details about Mother's interaction with Keri when both Mother and Keri were at her house. Grandmother recalled, however, that "they all" went trick-or-treating together on Halloween in 2007, presumably referring to Mother, Mariah, and Keri. Grandmother said that, when Keri came to Grandmother's home to visit, the purpose was for Keri to spend time with her and Mariah, as well as Mother.

Asked about Mother's employment, Grandmother testified that Mother had had a few jobs, but she did not keep them because "she had a hard time getting to them" and "she's not good at getting up" for the morning jobs. Grandmother said, "off and on she's had several jobs," including carving wood, pressure washing, cleaning out gutters, and a job at Berkline. Grandmother could not specify where Mother had worked during the pertinent four-month time period.

After they filed the termination petition, the Belchers hired a private investigator, Michael Hull ("Hull"), to determine where Mother was living at the time of trial. Hull testified that he surveilled Mother for the two months prior to trial. He discovered that Mother "move[d] around a lot." During this time, he said, he did not see Mother at Grandmother's house even

once, and consequently concluded that Mother did not live there. Instead, he concluded that she lived with an unidentified man at a home in Hawkins County. That concluded the trial testimony.

At the conclusion of the trial, the trial court issued an oral ruling that the Belchers had proven by clear, cogent, and convincing evidence that Mother abandoned Keri by failure to visit and failure to support during the four months preceding the filing of the termination petition. At the outset, the trial court found that the Belchers were more credible witnesses than Mother. Regarding the ground of failure to support, the trial court noted that it was undisputed that Mother had paid nothing to the Belchers during the pertinent time period, and found from the evidence that her failure to pay was willful. Reviewing the evidence, the trial court noted that Mother had testified that she knew she had a duty to support her child, and that she had the ability to pay but nevertheless failed to do so. The trial court found it significant that Mother was able to work, and that she had, in fact, worked multiple jobs. Mother's episodic unemployment and any resulting inability to pay, the trial court found, could only have been due to her willful unemployment. The fact that no court order required Mother to make child support payments, the trial court held, did not excuse her from her acknowledged obligation to support. "[T]he Court cannot find that the mother is excused from having to do anything toward the support of this child just because there was not a child support order down establishing support."

The trial court observed that the ground of abandonment by willful failure to visit presented "perhaps a closer question" because there had been "at least some contact between the mother and the child within the filing of the complaint," and the custody order provided that Mother's visits had to be supervised. The trial court then catalogued Mother's visits during the pivotal time period. It found that Mother had spent thirty to forty minutes with Keri at her September 2007 birthday party, and that Mother and Keri saw one another at the family Thanksgiving and Christmas celebrations that year, spending thirty to forty-five minutes together each time. In addition, the trial court found that Mother and Keri spent "some period of time" together when Mother visited the Belchers to discuss custody in January 2008. The trial court characterized the evidence on the alleged October Halloween 2007 visit as unclear and disputed. Noting that there was some testimony regarding other visits that may have occurred during the pertinent time, the trial judge said that he was "not convinced that more visits occurred." Considering all of the evidence, the trial court held that the visits between Mother and Keri that occurred during the pertinent time period were "token" within the meaning of the applicable statutes. On this basis, the trial court held that Mother failed to engage in more than token visitation with Keri within the pertinent four-month period, and that, therefore, she had abandoned the child by willful failure to visit. On January 3, 2010, the trial court entered a written order consistent with its oral ruling.

-11-

On February 16, 2010, the trial court convened a hearing to address the best interest portion of the case. At the hearing, Mother stipulated on the record that the best interest of the child would be served by terminating her parental rights. Accordingly, on that same day, the trial court entered a final order terminating Mother's parental rights and awarding full guardianship of Keri to the Belchers. From this order, Mother now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother argues that the trial court erred in finding clear and convincing evidence to support grounds for terminating her parental rights. She claims that the weight of the evidence did not support a finding that she had the ability to pay child support or that her failure to make child support payments was "willful." Mother also argues that the trial court erred in finding that no visits other than the birthday and holiday visits occurred, and in determining that her visitation with the child during the pertinent four-month period was "token" visitation. Alternatively, she argues, the trial court erred in determining that her failure to visit was willful under the circumstances, because during the relevant time period she was in the process of completing the safety plan in an effort to obtain custody of her child.

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tennessee Code Annotated § 36-1-113(l)(1)). "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While the biological parent's right is fundamental and superior to the claims of other persons as well as the government, it is not absolute. *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

In Tennessee, termination proceedings are governed by statute. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the

-12-

statutory grounds for termination. T.C.A. § 36-1-113(c)(1). Once grounds are established, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. T.C.A. § 36-1-113(c)(2).

Because of the profound consequences of a decision to terminate parental rights, courts apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. T.C.A. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808; *In re Valentine*, 79 S.W .3d 539, 546 (Tenn. 2002). This heightened burden of proof in parental termination cases minimizes the risk of an erroneous decision. *See In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence that meets the clear and convincing standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* (citations omitted); *see also In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).

In applying the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999). According such deference and utilizing the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to determine whether they are supported by the preponderance of the evidence; the factual findings are presumed to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The reviewing court then determines whether the combined weight of the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establishes all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B.*, 228 S.W.3d at 156; *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004).

The trial court's conclusions of law, including its conclusion that clear and convincing evidence supported termination, are reviewed *de novo* on the record, affording them no presumption of correctness. *In re Tiffany B.*, 228 S.W.3d at 156; *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

## ANALYSIS

### Abandonment

Mother's parental rights were terminated on the basis of "abandonment," pursuant to the following definition:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

T.C.A. § 36-1-102(1)(A)(i); *see* T.C.A. § 36-1-113(g)(1). In this case, the trial court found abandonment during the four-month time period preceding the filing of the Belchers' petition both by willful failure to support and willful failure to visit. The terms "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" are further defined in the statute:

> (D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child . . . .

T.C.A. § 36-1-102(1)(D). The term "willfully failed to visit" is also defined by statute:

> (E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation . . . .

T.C.A. § 36-1-102(1)(E).

In this case, it is undisputed that Mother had some visits with Keri during the four months preceding the filing of the petition for termination. The trial court found, however, that the visits that occurred were "token" visits. The term "token visitation" is defined in the statute:

> (C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing

-14-

more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child . . . .

T.C.A. § 36-1-102(1)(C).

At the core of the above-quoted definition of abandonment is the concept of "willfulness." A parent may not be found to have abandoned the child unless the parent has "willfully" failed to visit or support the child for a period of four consecutive months. *In re Adoption of Muir*, M2004-02652-COA-R3-CV, 2005 WL 3076896, at \*4 (Tenn. Ct. App. Nov. 16, 2005). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at \*5. This Court has explained the concept of willfulness:

> [W]illfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent have acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *Id.* Willful conduct is the product of free will rather than coercion. *Id.* A person acts willfully if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. *Id.* at 863-64. "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864 (citing *In re M.J.B.*, 140 S.W.3d [643,] 654 [(Tenn. Ct. App. 2004)]).

*In re J.G.H., Jr.*, No. W2008-01913-COA-R3-PT, 2009 WL 2502003, at \*15 (Tenn. Ct. App. Aug. 17, 2009).

The Supreme Court has held that, in the context of termination proceedings initiated by a private party as opposed to DCS, there need be no showing that the biological parent was aware of the consequences of her failure to visit or support her child, in order to show willfulness. *In Matter of M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009). This is because persons are presumed to know the law, and a parent should know that she has such responsibilities for her child. *Id.*

***Failure to Support***

In this case, Mother raises several challenges the trial court's conclusion that she abandoned the child by willfully failing to support her during the pertinent four-month period. It is undisputed, of course, that Mother made no payments toward the support of the child during the pertinent time period. She claims, however, that her failure to make such payments was not "willful" under the circumstances. She points out that she was not required under the operative custody order to make child support payments, that she testified she was not aware that such payments were required, and that she was not notified by the Belchers or anyone else that she was required to make child support payments or that her failure to make such payments could result in the termination of her parental rights. She claims as well that the trial court erred in finding that she had the ability to support the child, and that her episodic unemployment was willful. Mother argues that Keri's needs were being met by the Belchers and by the government benefits that were awarded to the child when she was born. Terminating her parental rights under these circumstances, Mother argues, creates a trap for the unwary and should be reversed.

Simply proving that a parent did not pay financial support for her child during the pertinent four-month period is not sufficient to show willful failure to support. ***In re M.J.B.***, 140 S.W.3d at 655. The evidence must establish that the parent's failure to support was "willful." ***Kleshinski v. Kleshinski (In re Adoption of Kleshinski)***, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 4, 2005). The requirement that a parent's abandonment for failure to support or visit be "willful" is both statutory and constitutional. ***In re Swanson***, 2 S.W.3d 180, 188 (Tenn. 1999).

In this case, the trial court found that Mother had the ability to pay child support during the pertinent time period and was aware of her obligation to pay child support, but that she willfully failed to do so. As noted above, our Supreme Court in ***In re M.L.P.*** held that parents are presumed to know the law and, in particular, are presumed to know their responsibilities to their children.[6] ***In re M.L.P.***, 281 S.W.3d at 392. "Mother's knowledge of a duty or expectation that she provide support and visit is a factor in determining willfulness." ***In re W.B., IV***, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *11 (Tenn. Ct. App. Apr. 29, 2005). ***See also In re M.J.B.***, 140 S.W.3d at 655 (finding a lack

_____

[6]The 2010 General Assembly enacted an amendment to Tennessee Code Annotated § 36-1-102(1), adding the following language:

> Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children.

2010 Pub. Acts, C.924 § 1, effective May 26, 2010.

of clear and convincing evidence to terminate when no evidence in the record proved that the mother was aware of her duty to make child support payments).

As noted by the trial court, Mother acknowledged in her testimony that she was fully aware of her duty to pay child support for Keri. In some of her testimony, Mother sought to retreat from her acknowledgment of her obligation. She testified that she "did have an obligation [to pay support], but it wasn't court ordered." She said that she "figured [the child's] welfare was pretty much taken care of with the [SSI] check." However, Mother also acknowledged that the SSI check did not come from her, and that she understood that the SSI check did not discharge her duty to support Keri financially.

Here, the trial court stated that the absence of a court order requiring Mother to pay support did not "excuse" Mother from her obligation to pay support for Keri. The trial court credited Mother's candid acknowledgement that she knew that she had an obligation to pay support but nevertheless failed to do so. According appropriate deference to the trial court's assessment of Mother's credibility, we find clear and convincing evidence to support the trial court's finding.

The trial court also found that Mother had the ability to pay support during the determinative four-month period. The undisputed evidence showed that Mother was in fact employed during at least part of the four-month period. Clearly she had the ability to pay some support, and it is undisputed that she paid none. Under these circumstances, we find clear and convincing evidence in the record to support the trial court's conclusion that Mother abandoned her child by willfully failing to support her during the four-month period preceding the filing of the termination petition.

### *Failure to Visit*

Mother next challenges the trial court's conclusion that she willfully abandoned the child by failing to engage in more than token visitation with the child during the four-month period prior to the filing of the petition for termination. She contends that the evidence shows that, in addition to the four visits that the trial court found, she telephoned Keri during the pertinent time period and also spent time with Keri while both were at Grandmother's home. In the alternative, she contends, that any failure to visit could not be deemed willful because, at the time the Belchers' petition was filed, Mother was in the process of completing the DCS safety plan in order to gain custody of the child.

We first address Mother's argument that the preponderance of the evidence weighs against the trial court's factual finding that only four visits occurred during the four months preceding the filing of the Belchers' termination petition. The trial court found that four

visits took place — in September, November, and December 2007, and in January 2008. It described the evidence regarding the October Halloween visit as disputed, but did not make a clear finding on whether the alleged October 2007 visit in fact occurred. The trial court recognized that none of Mother's visits were prearranged, and that none lasted over thirty to forty-five minutes.

Mother argues that the trial court erroneously ignored evidence that she sometimes called to talk to Keri and to ask the Belchers about her, particularly in light of the Belchers' admission that these calls took place. Mother also argues that the trial court erroneously disregarded Grandmother's testimony about occasions on which Keri stayed with Grandmother overnight while Mother was present. These visits, Mother argues, should have been considered by the trial court in its determination of whether Mother's visitation during the pertinent four-month period was "token" visitation.

From our examination of the record, the undisputed testimony appears to establish that Mother called the Belchers' home at times and spoke with Keri, but the evidence is unclear as to whether any of these calls occurred during the pivotal four-month period. Mr. Belcher testified that Mother called the Belchers "every three weeks or whatever," and allowed that Mother may have called "once or twice" during the pertinent time period. Mother asserted that she called the Belchers' home during the pertinent time period, but could not say how many times. The evidence on the substance of the calls, when they occurred, is not disputed; when Mother called, she would typically ask about Keri's well-being and speak briefly to the child. It is likewise undisputed that, given the fact that Keri was two years old during the relevant period, any "conversation" between Mother and the child consisted primarily only of "jibber" by the child. For purposes of this appeal, we will assume that Mother made a couple of these calls to the Belchers' home during the critical four-month period.

We make no such assumption regarding contacts between Mother and Keri during Keri's visits with Grandmother. Grandmother testified that Keri visited her while she lived in Kodak, and that "a few times" Mother came to her house while Keri was there visiting Grandmother and Mariah. Neither Grandmother nor Mother asserted that Mother had contact with Keri via Grandmother within the pertinent four-month time period. Mr. Belcher, whose testimony was credited by the trial court, testified that Keri did not visit Grandmother's house at all during the four-month time period.[7] Under these circumstances, we find that the preponderance of the evidence supports the trial court's finding that no such "visits" occurred during the relevant four-month time period. We find, then, that the evidence in the record supports the trial court's factual finding that the only in-person contacts that occurred

---

[7]Mrs. Belcher said that there were no overnight visits with Grandmother during the four-month period, but could not recall whether there was a daytime visit.

between Mother and Keri during the relevant time period consisted of Mother seeing Keri at family gatherings for Keri's birthday, Thanksgiving, Christmas, and perhaps Halloween, and Mother's short visit to the Belcher home in January 2008. We assume for purposes of our analysis that Mother made a couple of telephone calls to the Belchers' home during the four-month period and spoke briefly to Keri during these calls.

The issue, then, becomes whether Mother's contacts with the child during the pertinent time period constituted only "token visitation," that is, "nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." T.C.A. § 36-1-102(1)(C); *see In re M.T.*, No. W2002-03050-COA-R3-CV, 2003 WL 22351012, at \*4 (Tenn. Ct. App. Oct. 14, 2003). Whether visitation is "token" under this definition is a fact-intensive inquiry to be decided on a case-by-case basis. *See, e.g., In re M.T.*, 2003 WL 22351012, at \*4-\*5; *Coone v. Kratochvil (In re Kratochvil)*, No. 03A01-9712-CH-00536, 1998 WL 681334, at \*4 (Tenn. Ct. App. Oct. 2, 1998).

The trial court explained its reasoning for finding that Mother had engaged in merely token visitation during the four-month period:

> I'm forced to conclude that what contact there was here was just token contact. It was minimal, was insubstantial. It was of such short duration, and you've got a child that was born September 2005. She's two years old in September 2007 and . . . [Mother] spent three or four hours with her over a period of four months and then only on special family occasions where the whole family gets together for Thanksgiving, Christmas, for the child's birthday. That just is not . . . that's just perfunctory visitation. A parent who really wanted substantial contact with his or her child would have made the effort to visit more than that, especially when there is a court order down that at least provided for the fact of visitation, although with some lack of specificity as to what the visitation would be.

Thus, the trial court found that Mother's visits with the child were minimal, insubstantial, of short duration, and perfunctory.

Mother claims that the evidence at trial showed that her visits with the child were not perfunctory, because the testimony at trial indicated that she approached her visits with Keri with great interest. She prepared for the visits by getting gifts for the child to bring to her birthday party and to the Christmas celebration. Mother points out that she attempted to interact with the child at these visits, but the child was not interested in her because she wanted to play with other children. The evidence showed that Mother was upset by Keri's

-19-

response to her overtures. Mother argues that this evidence shows that she wanted a relationship with Keri and that the visits were not merely perfunctory, but were meaningful attempts to establish a relationship with her child.

We agree with Mother that her interest in a relationship with her daughter is relevant to the overall question of whether she willfully abandoned the child by engaging in only token visitation. We are frustrated in part by an early evidentiary ruling by the trial court, limiting the proof on visitation to contacts that occurred during the four-month period preceding the filing of the termination petition.[8] Certainly the statutory definition of abandonment in Section 36-1-102(1)(A)(1) requires the Court to focus on the parent's conduct during this four-month period. However, the parent's conduct and the relationship between the child and the parent up to this point is relevant background and context for the necessarily fact-intensive evaluation of whether the visitation *during* the four-month period was merely "token." For example, the significance of facts such as the setting and the length of time of the visits during the relevant time period is better assessed with an understanding of the parent's prior efforts to forge a relationship with the child, and whether a bond between parent and child had previously been established.

Nevertheless, we can glean the necessary information from the record in this case. In the trial below, Mr. and Mrs. Belcher testified that Mother had never called them to arrange a visit with Keri, and Mother conceded that she never asked for visits. Instead, during the entire time the Belchers had custody of Keri, Mother relied on sporadically "showing up" at family gatherings at which Keri might be present, or occasions when Keri visited Grandmother and sister Mariah. Mr. Belcher testified that, as of the date of Keri's September 2007 birthday party, Keri "didn't know" Mother, and Mrs. Belcher testified that, to Keri, Mother was "just a casual person coming to the party." This testimony was not refuted by Mother. Indeed, Mother candidly admitted that the time she had spent with the child to that point in the child's life "could not possibly have allowed [Mother] any reasonable opportunity to bond with [the child]." Moreover, the testimony on Mother's grief at the child's repeated lack of response to her overtures indirectly reinforces the Belchers' testimony that Keri did not really know Mother. Thus, it is clear from the record that, whatever contacts or visits had occurred between Mother and Keri up to the pivotal four-month time period, they were insufficient to result in any substantial relationship or bond.

With this background in mind, we consider the trial court's finding that the visits that occurred during the four-month time period amounted only to token visitation. This requires that we examine the frequency, duration, and quality of the visits that occurred.

---

[8]The correctness of this evidentiary ruling is not raised as an issue in this appeal.

We first look at whether the visits were "perfunctory."[9] As apparently had been the pattern prior to the statutory time period, the in-person encounters between Mother and Keri during the pertinent four-month period were not prearranged "visits" between Mother and the child. Rather, as the trial court noted, they were family gatherings where a large group of people was expected to attend and celebrate an event. It can be inferred from this that Mother was not interested enough to schedule visits with Keri. However, the proof also indicated that Mother planned sufficiently in advance of two of the gatherings to bring presents for Keri, and the evidence also indicated that Mother attempted, albeit unsuccessfully, to engage with the child at the gatherings, and was genuinely upset at Keri's lack of response to her. As noted above, we also assume *arguendo* that Mother telephoned the Belchers a couple of times during the four-month period to ask about Keri's well-being and speak briefly with Keri. All of this indicates some level of interest in Keri and in a relationship with her.

Therefore, this is not a situation in which Mother was merely physically present at visits and uninterested in her child. *See DCS v. L.L.T.*, No.E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003) (holding that visits are "perfunctory" when the mother had a "mere physical presence" with the child and was not focused on the child during the visit). Rather, giving Mother the benefit of all reasonable inferences, on these occasions, she wanted to engage with the child. In light of this evidence, we must respectfully disagree with the trial court's characterization of the visits and contacts as "perfunctory" within the statutory definition of "token visitation" in Section 36-1-102(1)(C).

We must go on, however, to examine whether the visits and contacts during the pivotal time period were "of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." T.C.A. § 36-1-102(1)(C). Here, three (or four, if Halloween 2007 is included) such contacts occurred at roughly one-month intervals, in a large group setting with other children present, lasting approximately thirty minutes each. The last visit, in January 2008, was not at a large family gathering, but lasted a similarly short time and appears to primarily have been for the purpose of ascertaining the level of the Belchers' resistance to an effort by Mother to gain custody of Keri. Any telephone calls by Mother to the Belchers' home add little to this equation; while they may have imparted information to Mother on Keri's well-being, there is no indication in the evidence that the child was even aware of the identity of the person on the other end of the telephone line.

There is little caselaw in Tennessee to give us guidance on token visitation. We apply the statutory definition of "token visitation" in light of the larger framework of the termination

---

[9] Webster's Dictionary defines "perfunctory" as: "characterized by routine or superficiality: done merely as a duty" or "lacking in interest or enthusiasm: apathetic, indifferent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1678 (1993) (unabridged).

statutes. Thus, while the parent's subjective intent and interest in the child is relevant, the termination statutes generally require that such interest manifest in the form of objectively reasonable action geared toward establishing a healthy parental relationship.

In this case, as noted above, prior to the critical four-month time period, Mother did not have a significant bond or relationship with two-year-old Keri. Against this backdrop, once-a-month[10] half-hour contacts with such a young child at large family gatherings cannot be viewed as a reasonable attempt to forge a meaningful relationship with the child. Indeed, while the child's lack of interest in Mother's overtures at these gatherings must surely have been disappointing to Mother, it could not have been surprising.[11] Under the circumstances, it was nearly inevitable.

We find that the evidence shows clearly and convincingly that Mother's contacts with the child during the pertinent four-month period were "of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." T.C.A. § 36-1-102(1)(C). Therefore, we conclude that the record contains clear and convincing evidence to support the trial court's finding that Mother engaged in merely token visitation during the four-month period preceding the filing of the termination petition.

Mother's final argument is that clear and convincing evidence did not establish that her failure to engage in more than token visitation with the child was willful under the circumstances. Mother bases this argument on the fact that she was "actively trying to complete the Court Ordered Safety plan by attending New Hope Recovery and attending parenting classes." In addition, just days before the termination petition was filed, Mother visited the Belchers for the purpose of informing them that she was attempting to accomplish the goals in the DCS safety plan so that she could petition the court for custody of Keri. This conduct, she argues, shows that she was "proactive in regaining custody of her child," and that the Belchers simply "won the race to the Courthouse steps." Mother argues, then, that the evidence of her conduct during the relevant period and the timing of the petition for termination are fatal to a finding of willfulness.

In support of this argument, Mother cites *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007), and *In re Chelbie F.*, 2007 WL 1241252 (Tenn. Ct. App. 2007). In *In re Adoption*

---

[10]We caution against a mechanistic application of our holding in future cases; under different facts, once-a-month contacts between parent and child may be reasonable visitation, not token.

[11]We do not intend to imply that the failure of a child to respond positively to the parent in a visit means, *ipso facto*, that the visit was merely a "token" visit. We recognize that children are children and may in any given visit be distracted or fail to respond to the parent for any number of reasons, despite the reasonableness of the parent's actions.

*of A.M.H.*, the biological parents of the child at issue had a history of visiting their child regularly at the home of the foster parents, but the visits resulted in enmity between the parties. Once the relationship between the biological parents and the foster parents deteriorated, the biological parents stopped visiting the child and actively pursued legal proceedings in the juvenile court to obtain custody of their child during the four months preceding the filing of the termination petition. The Supreme Court in *A.M.H.* held that, although the biological parents did not visit during the pertinent four-month period, they had "redirect[ed] their efforts at maintaining a parent-child relationship to the courts." In such a situation, the Court held, the evidence did not support a finding of "willful failure to visit" as a ground for abandonment. *In re Adoption of A.M.H.*, 215 S.W.3d at 810-11.

Similarly, in *In re Chelbie F.*, the biological parents of the child lived together "on and off" until they finally parted ways when the child was two years old. After that, the mother refused to allow the father to visit the child and refused to accept child support payments from the father. Later, the mother moved away with the child, and the mother did not disclose their new location to the father. Years later, when the mother remarried, the father discovered their whereabouts. The father then filed a petition in the local chancery court to set his visitation rights and his support obligation for the child. While his petition was pending, the father did not visit or pay support. Six months later, the mother and her new husband filed a petition in another county to terminate the father's parental rights, on grounds of abandonment. *Chelbie F.*, 2007 WL 1241252, at *2. After a trial, the trial court terminated the father's parental rights based on abandonment for willful failure to visit or support the child. *Id.* at *4-7. The father appealed.

The *Chelbie F.* court noted that *A.M.H.* was distinguishable in that, in *A.M.H.*, the parents had attempted to visit their child just five days before the pivotal four-month abandonment period began, and they were ordered by police officers to leave the home of the foster parents. In *Chelbie F.*, no such acrimonious confrontation had occurred. Nevertheless, the court noted that the mother had made it clear to the father after they ended their relationship that she did not want him to visit the child. Thus, the *Chelbie F.* court noted that the two cases were "similar in that they involve circumstances in which the child's custodians did not favor and had not encouraged the development of a relationship between the biological parent and the child." *Id.* at *6. The appellate court held that, consistent with the holding in *A.M.H.*, because the father was actively pursuing a court order for custody during the four months preceding the filing of the petition for termination, he did not willfully fail to visit the child. *Id.* at *4-7. Therefore, based on the holding in *A.M.H.*, the *Chelbie F.* court reversed the trial court's termination of the father's parental rights.

In this case, Mother concedes that she did not initiate any judicial proceedings during the pertinent four-month time period. She claims, however, that her attempt to satisfy the

requirements of the safety plan by undergoing out-patient drug treatment and her visit to the Belchers to inform them of her plan to seek custody of the child shows that her failure to visit was not willful under the reasoning employed in *A.M.H.* and *Chelbie F.*

In our view, the situation in the instant case differs from that presented in *A.M.H.* and *Chelbie F.* in an important respect. As noted by the *Chelbie F.* court, both cases involved circumstances in which the child's custodians discouraged the biological parents from visiting the child and were, to some extent, responsible for the parents' failure to visit during the pertinent four-month period. In the instant case, the Belchers asserted, and Mother conceded, that the Belchers did not impede Mother's visitation. Rather, the Belchers welcomed Mother into their home, invited Mother to Keri's birthday party, invited Mother to lunch, and at times invited Mother to attend church with the family. Mother acknowledged that no one prevented her from visiting the child.

In addition, there is no evidence that Mother's attendance at the drug rehabilitation program at New Hope Recovery prevented her from visiting Keri during the pertinent four-month period. The program was an outpatient rehabilitation program, and Mother was working at Cherokee Lumber during at least part of that time. The only condition to Mother's visitation was that it be supervised, due to her past substance abuse. Mother conceded in her testimony that she had a vehicle to enable her to visit Keri. Her failure to visit Keri outside of family gatherings, she admitted, was her own choice.

Thus, overall, there was no impediment to Mother's visits with Keri. Furthermore, Mother's statement to Mrs. Belcher that she planned to complete her tasks under the DCS safety plan and seek custody of her child after four months of only token visits with the child is not equivalent to actively seeking custody in the court system. Therefore, we do not find the holdings in *A.M.H.* or *Chelbie F.* applicable in this case.

As we have stated, the "[f]ailure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Adoption of Muir*, 2005 WL 3076896, at *5. Considering the record as a whole and the facts in this case, as found by the trial court and supported by a preponderance of the evidence, we agree with the trial court's holding that the proof establishes clearly and convincingly that Mother's failure to engage in more than token visitation with the child during the pertinent four-month time period was willful.

### Best Interest

After the trial court found grounds for the termination of Mother's parental rights, the parties stipulated that the best interest of the child would be served by terminating Mother's parental

rights. The evidence in the record supports this finding. To be sure, Mother testified that she attended the New Hope substance abuse rehabilitation program, and completed parenting classes soon after the petition for termination was filed. However, the evidence also showed that, as of the time of trial, Mother still did not have stable, independent housing or stable employment,[12] and that, after the filing of the petition, she was arrested twice, once for possession of narcotics and marijuana and once for public intoxication. These facts show that, despite Mother's expressed intent to complete the tasks for the DCS safety plan, rehabilitate herself, and regain custody of her daughter, her actions fell far short of the goals of the plan.

Thus, in addition to the parties' stipulation, the record shows by clear and convincing evidence that the best interest of the child would be served by termination of Mother's parental rights.

This holding pretermits all other issues raised but not addressed in this appeal. Accordingly, we affirm the trial court's decision to terminate Mother's parental rights.

### CONCLUSION

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Christy C., and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[12] Mother testified that her employment at the time of trial consisted of working for a man who was disabled, cleaning his house and caring for him. We surmise from her testimony that she performs this job on an irregular, as-needed basis. Mother did not testify about her wages or the permanency of this position.