IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 8, 2013

## IN RE COURTNEY N.

**Appeal from the Juvenile Court for Washington County**
**Nos. J13431 & J13432      James Nidiffer, Judge**

No. E2012-01642-COA-R3-PT - Filed May 31, 2013

Tina K. ("Mother") appeals an order terminating her parental rights to her daughter, Courtney N. ("the Child"), now age 12. The Child and her older sister, Tiffany N. ("Sister") (collectively "the Children") were placed in the protective custody of petitioners, Raymond and Charlene W., ("Uncle and Aunt"). They were subsequently adjudicated dependent and neglected in Mother's care. In January 2012, Uncle and Aunt, together with Janie Lindamood, the Child's court-appointed guardian ad litem, (collectively "Petitioners"), filed a petition seeking to terminate Mother's parental rights.[1] Following a bench trial, the court granted the petition after finding that multiple grounds for termination exist and that termination is in the Child's best interest. The court stated that it made both findings by clear and convincing evidence.[2] Mother appeals each of these determinations. We vacate the finding of abandonment based on conduct exhibiting a wanton disregard for the Child's welfare as such ground is not implicated by the facts of this case. In all other respects, the judgment is affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Partially Vacated; Termination of Parental Rights Affirmed; Case Remanded

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Charles J. London, Johnson City, Tennessee, for the appellant, Tina K.

---

[1]Tiffany N., was also named as a subject of the petition, but she was married and had reached the age of majority prior to the hearing in this matter.

[2]The order also terminated the parental rights of the Child's father, Bradley N. ("Father"). He did not appear at trial and is not a party on this appeal. We refer to him only as is necessary to recite the relevant facts pertaining to Mother.

Janie Lindamood, Johnson City, Tennessee, Guardian ad Litem for Courtney N.[3]

**OPINION**

I.

Mother and Father were divorced in 2006. Mother was awarded custody of the Children. Since then, Father had little contact with the Children. He had amassed a substantial child support arrearage. On March 14, 2011, Uncle and Aunt sought temporary custody of the Children and obtained an ex parte protective order against Mother. The petitions alleged that the Children were dependent and neglected as a result of being subjected to abuse, neglect, and illegal activity in Mother's care, *e.g.*, there was no food in the home, Mother's live-in boyfriend had made sexual advances toward Sister, Mother was using illegal drugs in the home while on probation, and Child Protective Services ("CPS") was actively investigating the situation. Mother essentially denied the allegations, except to admit that there was an open CPS case and she was on probation. She further asserted she was under no obligation to pay child support. The trial court granted custody to Uncle and Aunt pending a further hearing. In view of the protective order and the conditions of Mother's bond, the court prohibited Mother from having any contact with the Children. An adjudicatory hearing was set for April 28, 2011. Mother arrived at the courthouse on that date, but left because, according to her, she was afraid of being arrested on an outstanding warrant for violation of probation. At the rescheduled hearing on May 12, 2011, Mother was not present but was represented by counsel. After hearing the proof,[4] the court adjudicated the Children as being dependent and neglected and continued the "no contact" order. On that same date, the sessions court entered a one-year order of protection against Mother based on its finding that Mother committed the acts alleged and that she had placed the Children "in jeopardy and danger . . . due to her drug actions."

On January 1, 2012, a petition to terminate Mother's rights was jointly filed by the guardian ad litem and Uncle and Aunt. Uncle and Aunt proceeded as the Child's prospective adoptive parents. A bench trial was held on June 12, 2012. At that time, the Child was 11 and had resided with Uncle and Aunt for over a year. As a result of the no-contact order, Mother had not seen the Child during that time. We now summarize the proof at trial.

---

[3]The petitioners Raymond W. and Charlene W. joined in the brief filed by the guardian ad litem.

[4]The final order is in the record. The hearing transcript is not.

Aunt is Mother's aunt and the Child's great-aunt. She and Uncle divorced in 1980 but resumed a relationship.[5] They lived together with the Children in a three-bedroom home. Uncle and Aunt planned to remarry, but had not yet done so because of financial reasons. Aunt loved Mother and tried to support her, but didn't like the way she treated the Children. Aunt said Mother had not paid any child support since Aunt and Uncle had obtained custody. Since the Children were very young, Uncle and Aunt provided them with food and other necessities. Before they obtained custody, they gave the Children allowances for doing chores, but ceased the practice after the Children reported that Mother took the money from them. According to Aunt, the Children were in and out of their home throughout their childhoods and had stayed with them for months, even years, at a time. Aunt saw nothing to convince her that Mother was able to provide the Children with a safe, stable environment.

Sister, 18, was married but continued to live with Uncle and Aunt while her husband completed military training. She did not believe it was safe for the Child to return to Mother. Mother moved often and "you never knew who was going to come into our house and who was going to come out of our house or if we went home if we had the same house." Sister added Mother was "always taking us to [Uncle and Aunt's house] . . . and dropping us off." Mother took her and the Child to relatives' homes to get food; other times, they went to bed hungry. Mother sold their belongings or "lost" them when she couldn't pay storage fees between moves. Just before the dependency and neglect petition was filed, Mother allowed her then-boyfriend, C.L., to move into their home. Sister described him as "just a really nasty person." Sister, then 16, expressed her discomfort with C.L. and the way he looked at her, but Mother refused to make him move out. After Sister refused to allow Mother to borrow her car because she suspected Mother was going to go buy drugs, Mother threw her pictures of Sister into a trash can and ordered her to move out. Based on their past living experiences, Sister feared for the Child if she were to be returned to Mother. Sister loved Mother but in talking to her more recently saw that "things hadn't changed" and felt the Child would be an "easy target" for Mother. Sister related that Mother often told her that she wished Uncle and Aunt would adopt her and the Child and just let Mother see them once in a while.

The Child testified in the presence of only the court and counsel. She said that living with Mother was hard and she had "a lot of bad memories." The Child did not like C.L. and felt that Mother chose him over her and Sister. She was not afraid of him, but had seen him looking "dirty" at Sister. She did not feel safe or loved in Mother's care and at times there was no food. Mother frequently invited people into their home that the Child felt were "not nice." The Child loved Mother, but thought of Uncle and Aunt as her parents and felt well-cared for by them. The Child wanted both Mother's and Father's rights terminated because

_____

[5]As a result of the divorce, Uncle became the Children's ex great-uncle. For ease of reference, we refer to him as "Uncle" throughout this opinion.

"they've never took (sic) care of me like a real mom and dad should." The Child testified that Mother took too many pills, or sold them. Without her medication, Mother stood around crying and couldn't care for the Child. The Child told the court that if Mother had a nice, clean place to live, she still would not feel safe with her unless Mother "got help." Even then, the Child added, she did not want to give Mother time to work on her problems; she wanted to be adopted.

Mother, age 39 at the time of trial, testified that her only source of income was monthly SSI payments; her disability was related to "nerves" and depression. After the divorce, she received no child support from Father for several years, but he had made some payments since then. She admitted to living more places than she could recall. Mother said she trusted Aunt "as a babysitter" and had only allowed the Child to go stay with Aunt because Aunt pleaded with her to have the Children around. Mother denied that she had ever allowed the Children to live with Uncle and Aunt "long term." Mother said she loved the Child and they were "sweet" to each other. She opposed having her rights terminated because she felt a child should be raised by her biological mother. Mother admitted that C.L. moved in with her and the Children for "a couple of weeks" and deemed it "a real bad mistake." She said she ended the relationship, but added that C.L. was now her "stepbrother." Asked whether she would allow a man to live with her, with the Child present, Mother answered, "[n]ever again hopefully."

Mother told the court that she had made mistakes, but denied neglecting or abusing the Children in any way. She denied selling their food stamps, and accused Sister of falsely testifying that the Children were hungry to make Mother look bad. Mother conceded she never provided child support, but insisted she always put the Children first and did everything she could to make them comfortable and happy.

Mother testified she suffered with bipolar disorder and depression. She said that since losing the Children, she had obtained prescriptions for depression and anxiety, was taking them as ordered, and that she was seeing improvement. Mother testified she had not taken any narcotic drugs, but admitted to refilling a prescription for hydrocodone within the past three months. Weeks before trial, she began outpatient mental health therapy and counseling. Mother had a 2009 conviction for shoplifting. In March 2011, days after the Children were removed, Mother was arrested for communicating with the Children on Facebook in violation of the protective order. In November 2011, she was arrested for failure to appear in court. After giving officers a false name, she was also charged with criminal impersonation, to which she pleaded guilty. She admitted her probation was repeatedly revoked because she violated its conditions. At the time of trial, she had not yet been released from probation, but had paid most of her fines and court costs and passed the single drug test she was given.

Mother testified she moved in with her mother after "losing" the Children and was trying to get her "head straight." She had leased a two-bedroom apartment and planned to move in the day after trial. She had a driver's license, a car, and car insurance. Mother wanted a relationship with the Child but did not want custody restored against the Child's will. She told the court that she wanted what was best for the Child and was "just hoping for some visitation time."

Following the hearing, the court found that, as to Mother, three grounds for termination had been established: (1) abandonment by willful failure to provide child support; (2) abandonment by conduct evidencing a wanton disregard for the Child's welfare; and (3) persistence of conditions. The court further found that termination is in the Child's best interest. All of these findings were said to be made by clear and convincing evidence. Mother filed a timely notice of appeal.

## II.

Mother raises issues for our review that we restate as follows:

> 1. Whether the trial court erred in finding, by clear and convincing evidence, that [Mother] abandoned the [C]hild by willfully failing to support her.
>
> 2. Whether the trial court erred by considering the ground of "wanton disregard" when it was not appropriately pled.
>
> 3. Whether the trial court erred in finding, by clear and convincing evidence, that the conditions that lead to the [C]hild's removal still persisted and could not be remedied at an early date.
>
> 4. Whether the trial court erred in finding, by clear and convincing evidence, that it was in the best interest of the [C]hild to terminate [Mother's] parental rights.

## III.

This Court's duty is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence. *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de

novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon sufficient proof of appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

IV.

Mother challenges the trial court's finding of abandonment by willful failure to provide child support. She essentially argues that her admitted failure to support the Child is not willful given her circumstances.

Tenn. Code Ann. § 36-1-113 (g)(1)(2012) provides, in relevant part, as follows:

> (g) Initiation of termination of parental . . . rights may be based upon any of the following grounds:
>
> (1) Abandonment by the parent . . . , as defined in § 36-1-102, has occurred;

In turn, the cited Section 36-1-102(2012), provides for the termination of parental rights on the ground of abandonment by failure to support, in relevant part, as follows:

> (1)(A) For purposes of terminating the parental . . . rights of parent(s) . . . of a child to that child in order to make that child available for adoption, "abandonment'" means that:
>
>         \*   \*   \*
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) . . . have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i). Under subdivision (1) of Section 36-1-102, " 'willfully failed to support' or 'willfully failed to make reasonable payments toward such child's support' means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(D). In the present case, the relevant four-month-period for establishing abandonment by willful failure to support is September 30, 2011 to January 31, 2012, the date the petition was filed.

With respect to establishing abandonment based on the failure to provide child support, this Court has explained:

> At the core of the . . . definition of abandonment is the concept of "willfulness." A parent may not be found to have abandoned the child unless the parent has "willfully" failed to . . . support the child for a period of four consecutive months. "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." This Court has explained the concept of willfulness:
>
> [W]illfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent have acted with

malice or ill will. Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. Willful conduct is the product of free will rather than coercion. A person acts willfully if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

* * *

The Supreme Court has held that, in the context of termination proceedings initiated by a private party as opposed to DCS, there need be no showing that the biological parent was aware of the consequences of her failure to . . . support her child, in order to show willfulness. This is because persons are presumed to know the law, and a parent should know that she has such responsibilities for her child.

*In re Keri C*., 384 S.W.3d 731, 745-46 (Tenn. App. 2010) (internal citations omitted). To reiterate, as to the latter point, "a parent is liable for the support of his or her child throughout minority, with or without the existence of a court order. . . ." *Kirkpatrick v. O'Neal*, 197 S.W.3d 674, 680 (Tenn. 2006).

At the start of trial, Mother acknowledged that there was an order requiring her to pay child support, though no certain amount was specified. The proof showed that in March 2011, after losing custody of the Child, Mother gave up her apartment and moved in with her mother. She continued to live with her mother and/or her grandmother when trial began more than a year later. Presumably, her living expenses were thereby lowered. Also during that time, in addition to her own income, Mother received $1046.15 in child support payments paid by Father. In the months before trial, she received an additional $300. She admitted she never gave any of the payments she received to Uncle and Aunt for the Child's benefit. Instead, she put it to her own use, buying a cell phone, for example. She gave various reasons for her failure to pay child support, including her limited income, her initial lack of awareness of a support obligation, and her fear of violating the no contact order. Mother testified she still had some of the money and could "give [the Child] the money back if that's what I have to do."

With respect to this ground, the court found, in relevant part, that Mother was aware of her obligation and "acknowledged that she could have paid some child support, but she chose not to." The court further noted Mother's admission that "she took child support paid by the father . . . during the time that she did not have custody of the [C]hild, and used the

support for her own use instead of paying the same to the guardian[s] . . . ." The court concluded that Mother's admitted failure to pay any child support since the Child was removed from her custody was willful. We agree. In short, Mother was aware she had an obligation to pay child support, had money available to her, from whatever source, and decided not to pay child support without any justifiable excuse.

The evidence does not preponderate against the trial court's findings. The trial court did not err in terminating Mother's rights on the ground of abandonment based on her willful failure to support the Child.

V.

The trial court further terminated Mother's rights based on its finding that she acted in "wanton disregard" of the Child's welfare. Mother asserts that the trial court erred in considering this ground because it was not alleged in the petition. We need not decide whether Mother is right or whether the challenged ground was otherwise noticed and actually litigated at trial, as Petitioners contend. Instead, we conclude that, under the facts presented at trial, abandonment by wanton disregard is not implicated by the proof as to Mother and cannot serve as a basis for terminating her parental rights.

We revisit Section 36-1-102(1)(A)(iv), which additionally defines "abandonment" as a ground for termination as follows:

> A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or *the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child*; . . . .

(Emphasis added).

In *In re Audrey S.*, 182 S.W.3d 838, 870 (Tenn. Ct. App. 2005), this Court closely examined the appropriate application of Section 36-1-102(1)(A)(iv). We observed:

-9-

The text of Tenn. Code Ann. § 36-1-102(1)(A)(iv) is somewhat cumbersome, but it is not ambiguous. It begins by describing the class of people to whom the statute applies:

A parent or guardian [who] is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or [a] parent or guardian [who] has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding.

Next, the statute describes two distinct categories of parental behavior that amount to abandonment *when engaged in by a person who falls within the designated class*: (1) "willful failure to visit or . . . support or . . . make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration;" and (2) "conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child."" Tenn. Code Ann. § 36-1-102(1)(A)(iv).

(Emphasis added.) As we concluded therein, "[t]hese additional tests for abandonment apply *only* if a parent is incarcerated at or near the time of the filing of the termination petition." *Id*. at 865 (emphasis added).

Returning to the case at bar, nowhere in its opinion, or its findings in support thereof, did the trial court reference Section 36-1-102(1)(A)(iv) or find that it applied to Mother, who spent a total of six or seven hours during one day in jail in the months before the petition was filed. On our considered review, we conclude that this does not place Mother within the class of "incarcerated or recently incarcerated parents" to which Tenn. Code Ann. 36-1-102(1)(A)(iv) applies. Accordingly, the trial court erred in terminating Mother's rights on the ground of abandonment based on "conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child" pursuant to Section 36-1-102(1)(A)(iv). This ground is hereby vacated.

We proceed mindful "that only one of the statutory grounds must be proven in order to establish sufficient grounds for termination of parental rights." Tenn. Code Ann. §36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

VI.

The trial court also terminated Mother's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C). That section, commonly referred to as "persistence of conditions," establishes a ground for termination where:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Mother challenges the trial court's finding of clear and convincing evidence to establish persistence of conditions pursuant to Section 36-1-113(A). She asserts that she has remedied all of the conditions that led to the Child's removal so that none remain that would subject the Child to further neglect or abuse. The evidence shows otherwise.

As we have noted, the Children were placed with Uncle and Aunt for their immediate care and protection. Mother first testified she was unaware of the rescheduled dependency and neglect hearing; but she then told the court: "I didn't know how important the circumstances were is what I'm trying to say. . . ." In its adjudicatory order, the court found that the Children were at risk of harm if returned to Mother – they had been exposed to illegal drug activity, went without housing, food, and proper care, and were subjected to mental abuse. The order contains a list of tasks that Mother was required to complete before custody could be restored, as follows:

> Resolve all pending legal matters.
> Obey all laws.

Obtain and maintain an appropriate house for [the Child] for a period of at least six months.

Pay child support.

Obtain a psychological assessment and follow all recommendations.

Enroll and participate in intensive mental health therapy or counseling.

Enroll in intensive parenting classes, successfully complete said classes and be able to demonstrate appropriate parenting skills.

Obtain an alcohol and drug assessment, and follow all recommendations.

Be subject to random drug testing.

Keep the Court and Guardian ad Litem apprised of current address[] and phone numbers.

No appeal of the adjudicatory order was taken. Clearly, the listed tasks were specifically tailored to Mother's circumstances. It should be readily apparent that Mother could not expect to remedy the conditions that led to the Child's removal without taking action to complete her assigned tasks. For nearly a year, however, she did nothing to regain custody. Mother admitted that she received the adjudicatory order and was aware of what she needed to do. At first, however, she was not "focused," and didn't think the situation "was so serious" until her second – now current trial – attorney was appointed in April 2012. She admitted making little progress until just before trial, when she was motivated to make some changes.

In support of its finding of persistence of conditions, the trial court found that the "conditions that caused the removal [have] persisted from March 2011, until the hearing on June 21, 2012" with few exceptions. The court credited Mother with obtaining housing and beginning to address her mental health problems through intensive outpatient therapy, albeit on the eve of trial. The court observed that remaining tasks had not been accomplished. Mother's own testimony corroborated that conclusion – she had not fully complied with the terms of her probation, obeyed the laws, or maintained appropriate housing for a period of six months. She had not undergone a current mental health assessment, attended intensive parenting classes, or paid anything toward the Child's support. The court found:

There is clear and convincing evidence that conditions still persist . . . which would cause the [C]hild to be subject to further abuse and neglect and which . . . would prevent the [C]hild's return to the care and custody of either [Mother or Father]. Of

-12-

late [Mother] has made some attempts to change her life, the
court finds that her attempts are too little and too late.

Based on all of the evidence, the court concluded that Mother "simply failed to comply in a substantial manner with parental responsibilities." The evidence does not preponderate against the trial court's findings made by clear and convincing evidence that termination is appropriate under the ground of persistence of conditions. The trial court did not err in terminating Mother's rights on this ground.

## VII.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interest[]." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Once grounds for termination have been found, the focus of the proceedings shifts to the best interest of the child. *Id*. In the present case, we have concluded that the trial court properly found grounds for terminating Mother's parental rights. We next consider whether termination is in the Child's best interest. We are guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(i).[6]

---

[6]The factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(continued...)

At the outset, we note that the trial court found that Mother was "not a credible witness," but that the Children were "extremely creditable (sic) and believable witnesses." The trial court set out its best interest analysis as follows:

> [T]here is clear and convincing evidence . . . that [Mother] [has] not made such an adjustment of circumstances, conduct, and conditions as to make it safe and in the [C]hild's best interest to be in [her] home[], despite [Mother's] recent efforts.
>
> [Mother][,] due to her own conduct was prohibited by the courts from visiting the [C]hild, and she has been found to be [a] danger to the [C]hild so as to not allow [Mother] to have contact with the [C]hild. . . .
>
> The [Children] . . . have offered testimony of illegal drug use in [Mother's] home, and abuse of drugs by [Mother].
>
> [Mother] . . . has taken the child support . . . and used it for her own wants after she lost custody of [the Children].
>
> [The Child] is placed with a relative placement, and those relatives wish to adopt the [C]hild.
>
> The [C]hild has developed a strong bond with the placement family, and the [C]hild wants to remain [there] and to be adopted.

---

[6](...continued)
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

\*     \*     \*

> There is clear and convincing evidence that it is in the best interest for the [C]hild . . . to be made available for adoption.

\*     \*     \*

> [T]he home of [Uncle and Aunt] meets the current needs of the [C]hild. [Their] home has and can continue to provide the minor [C]hild with stability and continuity of care as well as meeting the [C]hild's physical, mental and emotional needs.

The proof showed that Mother did little in the way of adjusting her "circumstance, conduct, or conditions" so as to create a safe environment for the Child. Mother waited until shortly before trial to begin undergoing therapy for her drug use and mental health issues, which prevented her from showing that these problems were resolved to the point that Mother could *begin to* properly care for the Child. Mother did not obtain housing until the eve of trial and it remained to be seen whether she could maintain her new residence or would continue her pattern of frequent moves. As to her lack of contact with the Child, Mother testified that she decided to abide by the court's decision concerning the no contact order; she made no effort to appeal or modify the order or establish supervised visitation with the Child. As the court noted, Mother had done nothing in the way of parenting classes. Perhaps more disturbing than Mother's little to no progress in these areas was her refusal to acknowledge that she needed to make significant changes in order to create a safe, stable and caring environment for the Child. At trial, Mother admitted to making some mistakes, but concluded that she had always put the Children first, and "wouldn't change anything [she had] done for [the Children]."

Aunt described her view of the Child's best interest at trial:

> [The Child] is very satisfied where she is. . . . She . . . wants to be with us. She has asked several times to be adopted. She's happy. She knows when she comes from school she's got a home to come to. She knows when she wakes up in the morning there's always food for her to eat and she doesn't worry about anything. She is open and free and happy at our place.

She noted the Child's grades and attendance record had improved in the time she lived with Uncle and Aunt. For her part, the Child tearfully testified that she loved Mother, but was emphatic that she wanted Mother's rights terminated so she could be adopted. At the

conclusion of the termination hearing, the Child told the judge, "thank you for trying to help me." It is evident to us that the trial court, on considering the best-interest question from the Child's perspective, agreed. Earlier in its opinion, the court stated:

> The [C]hild has bonded with [Uncle and Aunt], . . . who are prospective adoptive parents who . . . can provide a safe, loving, and stable home environment . . . . [M]ore importantly, the [C]hild does not want to be reunited with [Mother]. . . .

The evidence does not preponderate against the trial court's findings. There is clear and convincing evidence showing that the Child's best interest is served by permanently severing Mother's parental rights.

## VIII.

That portion of the trial court's judgment based upon "wanton disregard" is vacated. The remainder of the judgment, including the portion terminating Mother's parental rights, is affirmed. Costs on appeal are taxed to the appellant, Tina K. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE