IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 17, 2013 Session

IN RE JOSHUA P. ET AL.

Appeal from the Juvenile Court for Hawkins County
No. HJ-10-0944      Floyd W. Rhea, Judge

No. E2012-02165-COA-R3-PT-FILED-JULY 15, 2013

This termination of parental rights case concerns Joshua P. and Quinn W. ("the Children"), the children of G.W. ("Mother"). The Children were placed in the protective custody of the Department of Children's Services ("DCS") after both parents were arrested. Later, DCS petitioned the court to terminate Mother's parental rights.[1] Following a bench trial, the court found that multiple grounds for termination exist and that termination is in the Children's best interest, both findings said to be made by clear and convincing evidence. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Douglas T. Jenkins, Rogersville, Tennessee, for the appellant, G.W.

Robert E. Cooper, Jr., Attorney General and Reporter, and Marcie E. Greene, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]The parental rights of the Children's biological father, M.P., ("Father"), were terminated in a separate proceeding. Father did not file an appeal. We refer to him only as is necessary to recite the underlying facts relevant to Mother's appeal.

# OPINION

## I.

At the time of the trial, Joshua was nearly ten and Quinn was four. They had been in foster care for nearly three years. We summarize the relevant facts. Mother and Father were never married to each other. In 2007, they moved to Tennessee from the Chicago area where both children had been born. They lived with Mother's father, T.W., ("Grandfather") in an old house on a farm in Edson. Joshua testified to filthy living conditions there – with dog feces and urine "everywhere." He also mentioned soiled mattresses. Joshua said he often took care of Quinn, then an infant, by mixing his formula and feeding him. Father was physically violent toward Mother, and Mother "got hit a lot." He saw plants growing in a closet with lights hanging above them. Joshua felt Mother was a good parent, but wanted to remain with his foster parents. He believed he and his brother would be adopted because their foster parents had been good to them. Joshua testified to an incident when he found Mother awake and laying naked across his mattress. He climbed on top of her and pretended to have intercourse with her. He told his foster parents about the incident a few months after he came into their care. Joshua testified that he had come to realize the incident was Mother's fault.

As the parents' relationship deteriorated, Mother moved out of the home and began living with R.M., a "friend" who lived in a trailer next door. Joshua remained with Father, while Mother took Quinn with her. Joshua acknowledged that Mother told him that she loved him and was not abandoning him. She said that she had to leave because Father was "mean" to her. Mother and the Children went back and forth between the two homes and one or both children were often left in Father's care. Ultimately, Mother and R.M. became engaged and were married. In January 2009, DCS became involved with the family when case workers accompanied sheriff's deputies to speak with Mother regarding suspected child abuse involving R.M.'s 14-year-old son, C.M., who lived with R.M. and Mother. During questioning, Mother gave a signed statement in which she admitted to one incident of performing fellatio on C.M. Consequently, Mother was arrested for aggravated statutory rape. At the same time, officers investigated Grandfather's home, which led them to arrest Father for manufacturing marijuana. Based on both parents' arrest and the "environmental issues" and safety hazards in Grandfather's home, the Children were placed in protective custody.

In February 2009, the first permanency plan was established with a goal of "return to parent."[2] A revised plan would later change the goal to adoption, but Mother's obligations remained the same. They included, among other responsibilities, exercising regular visitation with the Children, resolving all legal matters, attending parenting classes, paying child support, completing alcohol and drug assessments and following all recommendations, providing documentation of continuing mental health treatment and progress reports to DCS, and providing a safe, stable, clean, and suitable home environment. The DCS case manager agreed that Mother visited regularly. Other than this, Mother provided no proof that she had completed any of her required actions. Mother disputed the case manager's testimony and insisted she had completed the requirements of the first permanency plan.

In March 2009, the juvenile court adjudicated the Children to be dependent and neglected in Mother's and Father's care. In June 2009, pursuant to her guilty plea, Mother was convicted of aggravated statutory rape. She was sentenced to two years in prison and ordered to register as a sex offender. She began serving her sentence on June 26, 2009. After serving eighteen months, she was released. Mother had completed the terms of her probation at the time of trial.

R.M. testified in support of Mother. He had interacted with Joshua before the child was removed. He said that he knew him to stretch the truth at times. R.M. did not believe anything inappropriate occurred between Joshua and Mother. As to Mother, R.M. had observed her with the Children and felt she was able to parent them properly. He admitted that he and Mother continued to drink alcohol, but said their consumption was not to excess. R.M. observed Mother's visits with the Children and said they were "excited and happy" to see her. He said the visits went well. He testified Mother attempted to resume the visits soon after her release from incarceration but that her efforts were thwarted. Regarding Mother's conviction, R.M. said that he did not believe Mother "ever did the act."

Mother, 43, testified she is bipolar, was in counseling in Chicago, and "signed up for help at a bunch of mental hospitals" as soon as she came to Tennessee. She advised DCS that she was in counseling at Frontier Health. She admitted she continued to struggle with alcohol; she had been sober five years up until the Children were removed. She said she turned to alcohol again in her depression. Mother had worked as a chef and cook in Chicago, but was not employed in Tennessee. She testified she could not hold down a full-time job because of "a host of medical problems . . . and the depression has really incapacitated me." She applied for social security disability benefits based on bipolar disorder, arthritis, bursitis, and a spinal injury, but her application was not processed because of her incarceration.

---

[2]Separate, but essentially identical plans were initially created. We refer to them in the singular for ease of reference.

Mother said she never received a letter advising her that she was required to pay child support. Regarding her mental health records, Mother could not recall whether she ever signed a waiver to release them to DCS. Mother conceded she told DCS that she would not agree to turn over everything, because her later records detailed "really deep down painful childhood things" she discussed in counseling. Mother absolutely denied Joshua's claim of any type of sexual contact between them. Mother believed Joshua made up the story because he figured it was a way to make sure he stayed in a better home. Despite her conviction, Mother also denied any sexual interaction with C.M., now her stepson. She attributed the matter to a rumor started at C.M.'s school that was ultimately reported to school officials and R.M.'s ex-wife, who reported it to authorities. Mother said she signed the confession after detectives convinced her she could avoid going to court and serving a lengthy sentence and the matter would "go away" after she attended counseling. Mother testified that DCS staff repeatedly told her that her conviction would not affect her ability to regain custody.

DCS filed a petition to terminate Mother's parental rights on September 15, 2010. Mother was still incarcerated when the petition was filed. The grounds alleged included severe abuse against a minor in the home, *i.e.*, C.M., abandonment by failure to visit and failure to provide a suitable home, and substantial noncompliance with the permanency plan. Susan Bishop Augusta, the Children's DCS case manager, testified that Mother never paid child support after the Children were taken into DCS custody. She testified that Mother was made aware of her support obligation at multiple child and family "team" meetings at DCS. Furthermore, the payment of child support was a stated requirement in the permanency plan, which she signed, and an order to pay support was entered by the juvenile court. As to income, Mother indicated only that she was trying to apply for social security disability benefits. She provided no documentation regarding her application. As to mental health treatment, while Mother said she was receiving counseling, she never provided supporting documentation regarding her participation or progress. There was no proof that Mother ever completed the required mental health and alcohol and drug assessments. DCS received no further information from Mother following her incarceration.

At the conclusion of trial, the court terminated Mother's rights. The court found that Mother abandoned the Children by willfully failing to support them and that she failed to comply substantially with the permanency plan. The court further found, also by clear and convincing evidence, that termination was in the best interest of the Children. Mother filed a timely notice of appeal.

II.

Mother presents two issues for our review:

The evidence did not clearly and convincingly establish that Mother abandoned the Children.

The evidence did not clearly and convincingly establish that Mother failed to comply substantially with the permanency plan.

As can be seen, she does not challenge the trial court's "best interest" determination.

III.

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded a trial court's determinations of witness credibility, which we do not disturb absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

As this Court has observed:

It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 (Tenn. Ct. App. E.S., filed Oct. 4, 2011)(citations omitted).

IV.

A.

As we have noted, the trial court found that two grounds for termination – abandonment by failure to provide child support and substantial noncompliance with a permanency plan – were proven by clear and convincing evidence.  We consider those grounds in turn, mindful that only a single ground must be proved to justify termination. *In re Audrey S*., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

B.

Tenn. Code Ann. § 36-1-113(g)(1)(2010) provides for termination when "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred…."  In turn,  Tenn. Code Ann. § 36-1-102(1)(A)(iv)(2010) defines abandonment, as pertinent to Mother, who was incarcerated at the time the petition was filed, as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration. . . .

Under subsection (1) of Tenn. Code Ann. § 36-1-113(g), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child. . . ."

"Failure to visit or support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."  *In re Keri C*., 384 S.W.3d 731, 745 (Tenn. Ct. App. 2010) (internal citations omitted). Moreover, "a parent is liable for the support of his or her

-6-

child throughout minority, with or without the existence of a court order. . . ." ***Kirkpatrick v. O'Neal***, 197 S.W.3d 674, 680 (Tenn. 2006).

In the case at bar, the trial court found that Mother willfully failed to support the Children and thereby abandoned them. The court stated:

> The First Permanency Plan signed by [Mother] was in February [2009]. Said Permanency Plan which [Mother] signed. . ., specifically stated that the parents would provide support. There is a moral and ethical obligation to support children, unquestionably this is the law. . . . The Court was somewhat surprised when [M]other testified that had she received a letter in the mail, she would have paid the support. But since she did not get a letter in the mail, she did not pay support. However, she stated that she could have. [T]he procedure and criteria for Termination of Parental Rights document that she signed on two occasions clearly set out that support has to be paid and moreover, she signed acknowledging she agreed with the Plan. So there is no question she did not pay, and given her admission that she would and could have paid had she been ordered, her defense does not hold water. The Court would point out, in the April 19, 2009 Court order, [Mother] was present and represented by counsel, [when] Judge Taylor ordered support to be paid, albeit no definitive dollar amount. . . . [T]he Court has to conclude she was made aware at that point of the court-ordered obligation to pay support.
>
> [Mother] further testified that she helped her father do farm work . . . , and that she did chores, cleaned house et cetera, and she testified, "He paid me well." So the Court finds that she had the present ability to pay support and failed to do so, and that her failure was willful. The Court finds the evidence is of a clear and convincing nature.

On this appeal, Mother essentially asserts that her admitted failure to pay any child support at all since the Children were removed to DCS custody was not willful. She submits she would have paid had she known child support was required. On the other hand, she submits she had no income with which she could have paid support. On our review, there is no support in the record for either of Mother's contradictory positions.

The trial court accurately summarized the relevant proof. At trial, Mother testified that if she had received a letter advising her of her obligation to pay support, she could and would have paid. Mother testified she brought snacks and "bags of clothing" to the Children during their visits and believed she was doing all that was required. Mother reiterated, "And had I been asked to pay, I would have paid." She could not recall whether any of the case workers ever advised her to pay some amount of support. She added that, while in prison, she became aware that the child support enforcement division did not show that she owed any child support. Her case manager testified that this notification was simply a recognition that she was then incarcerated.

Other testimony showed that Mother attended child and family team meetings, some with her counsel, at which the permanency plan was developed and reviewed. She agreed to its terms and signed the plan. The initial plan, the terms of which were said by Mother to be satisfactory to her, expressly stated that

> [Mother] will pay child support. Parents need to contact Child
> Support Enforcement Agency [and listed the phone number] to
> start making payments.

She also received a copy of the criteria for termination of parental rights, including the statutory definition of abandonment based on the failure to provide child support. Mother testified that she was financially able to support the Children. She explained that, in addition to social security, Grandfather received $4,000 a month in "family money" that "keeps us all living fine." She testified she was well-paid for the work she did around the farm, and the money Grandfather provided was "plenty to run both households."

Given the evidence at trial, there was clear and convincing proof that Mother willfully failed to support the Children during the four months prior to her incarceration – that she was made aware of her support obligation, that she had the ability to pay, and that she gave no justifiable excuse for failing to provide for the Children. The trial court did not err in terminating Mother's rights on the ground of abandonment by willful failure to pay child support during the relevant four-month period.

C.

Next, DCS alleged, and the trial court found, by clear and convincing evidence, that Mother failed to comply substantially with her responsibilities as set forth in the Children's permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2). Mother argues that any failure of compliance was not substantial and cannot support termination of her rights.

Pursuant to Tenn. Code Ann. § 36-1-113(g)(2), termination of parental rights may be based on a finding by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . . ." This Court has elaborated that "[p]arents are responsible for addressing the conditions that either led to the child's removal or prevent the child's safe return to the parent's custody, and they must make reasonable efforts once DCS has made services available to them." *In re Chase A.C.*, E2009-01952-COA-R3-PT, 2010 WL 3257711 at *18 (Tenn. Ct. App. E.S., filed Aug. 18, 2010). With regard to the degree of "noncompliance" required to support terminating a parent's rights, this Court has observed:

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. [DCS] must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place . . . , and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.

*In re M.J.B.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004)(internal citations omitted).

Returning to the present case, the trial court found that Mother had not complied substantially with the terms of the permanency plan:

> The history here of [Mother], and by her own admission when she was candid, is that she has suffered from emotional and mental problems, suffered from substance abuse problems, received treatment for those problems periodically and was receiving mental health care at the time of, and before the removal. But the Permanency Plan that she signed and agreed to said she must provide records. She failed to do so. She refuses to let the Court see them today, and that is substantial non-compliance with that one condition in the . . . Plan.
>
> The . . . Plan further required an alcohol and drug assessment to be conducted, and to follow the recommendations. That did not

occur. [W]hen the Department has removed children from a parent and a Permanency Plan has been ordered by the Court, . . . even more weight should be give it if it is agreed to, [and] the parent had the burden of complying with that Plan. Here the goal was mental health and A&D assessments, which was already happening according to [Mother]. She just failed to follow up and provide proof of treatments. A separate step in the [P]lan was to pay support which has already been addressed. . . .

Based on [Mother's] duty and agreement to comply with the . . . Plan, which was reasonable given her mental health history and her alcohol and drug history, it was incumbent upon her to provide the Department proof that she was receiving the treatment necessary to prevent her from lapsing either emotionally or into her excessive use of alcohol

The Department has proven the ground of failure to comply with the permanency plan in this matter by clear and convincing evidence.

The proof at trial showed that Mother had completed some of her "action steps" outlined in the plan, but completely failed to address other areas. Mother testified that she was aware of the plan and agreed to it, but never received a copy. She understood there were two requirements for her to complete – resolve her criminal/legal issues and complete a parenting class, all of which, according to her, she did. She had served her sentence and been released from probation. In February 2011, she completed a parenting class. In addition, she regularly visited the Children before she went to prison.

As far as her failure to pay child support is concerned, Mother explained that she could pay back what was owed if necessary. Perhaps, more significantly, Mother failed to provide any documentation evidencing her continued mental health treatment or progress reports for any treatment she was receiving. There was no proof she ever underwent the required mental health, alcohol, and drug assessments; hence, there was no proof of any recommendations following such assessments. Certainly, Mother's mental health and her ability to care for and supervise the Children going forward was significant with respect to her ability to have custody restored. Mother acknowledged that before she reported to prison, she once awoke to find herself hospitalized after slitting her wrists, but said she had no memory of the incident. She attributed her apparent action to the various medications

prescribed for her mental health issues. Mother said her health had further deteriorated since she lost custody of the Children and admitted she had resumed using alcohol.

Given these facts, we conclude that the evidence does not preponderate against the court's finding, made by clear and convincing evidence, that Mother was in substantial noncompliance with the permanency plan.

## V.

As we have previously noted, Mother has not challenged the trial court's "best interest" determination. While this matter was not raised as an issue, we deem it important enough to be addressed. *See **In re Arteria H**.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010). We have reviewed the record and determined that there is clear and convincing evidence that termination of Mother's parental rights is in the best interest of the Children. Therefore, we affirm the trial court's "best interest" determination.

## VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, G.W. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.


_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE