IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 19, 2015

**IN RE MALINA W., ET AL.**

**Appeal from the Chancery Court for Lewis County**
**No. 2013CV130      Deanna B. Johnson, Chancellor**

_____

**No. M2015-00326-COA-R3-PT – Filed September 29, 2015**
_____

In this termination of parental rights case, the father appeals the trial court's termination of his parental rights to his two daughters on the grounds of abandonment by failure to visit and support the children in the four consecutive months preceding his incarceration and conduct prior to his incarceration that exhibited a wanton disregard for the welfare of the children. The father also asserts the court erred in finding that termination was in the children's best interest. We fail to find clear and convincing evidence to support the trial court's conclusion that the father abandoned the children by failing to visit or support them in the four months preceding his incarceration; however, we affirm the trial court's finding that father engaged in conduct prior to his incarceration that exhibited a wanton disregard for the welfare of the children. Likewise, we affirm the court's best interest determination. The trial court's finding that father's parental rights should be terminated is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed, as Modified**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, and W. NEAL MCBRAYER, JJ., joined.

Richard Boehms, Centerville, Tennessee, for the appellant, Brandon W.

Gene Hallworth, Columbia, Tennessee, for the appellees, Angela and Clay M.

**OPINION**

FACTUAL AND PROCEDURAL HISTORY

Brandon W. ("Father") and Angela M. ("Mother") are the parents of two daughters:

Breanna, born in May 2008, and Malina, born in December 2012. Father and Mother were never married, but they dated and lived together on and off for several years from 2005 to November 2012. Father spent time in jail for various offenses throughout his courtship with Mother. His most recent incarceration, for violation of probation, began in May 2013.

On June 14, 2013, Mother married Clay M. ("Stepfather"). On November 14, 2013, Mother and Stepfather filed a petition for termination of Father's rights and a petition for adoption by a stepparent.[1] As grounds for termination, Mother and Stepfather alleged that Father had abandoned the children by failing to visit or support them for a period of four months prior to his incarceration and that Father had engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the children pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv). On December 17, 2014, Father filed a "Motion to Dismiss for Improper Venue and/or Lack of Standing." Father asserted that Mother, Stepfather, and the children lived in Florida, and thus, pursuant to Tenn. Code Ann. § 36-1-115, Mother and Stepfather lacked standing to file the adoption petition in Tennessee.

On December 18, 2014, the trial court held a hearing at which Mother, Father, Stepfather, and Father's mother testified.[2] On January 16, 2015, the trial court entered an order denying Father's motion to dismiss, concluding that the residency requirements of Tenn. Code Ann. § 36-1-115(d) and (e) did not apply to Stepfather. The court entered a separate order on January 16, 2015, terminating Father's parental rights and permitting Stepfather to adopt the children. The court found clear and convincing evidence that Father had abandoned the children by failing to visit and support them and had engaged in conduct prior to incarceration that exhibited a wanton disregard for the children. The court further held that terminating Father's rights was in the children's best interests. Father appeals.

ANALYSIS

Parents have a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of their own children. *Stanley v. Illinois*, 405 U.S. 645, 651

---

[1] Pursuant to Tenn. Code Ann. § 36-1-113(b), Mother has no standing to petition for the termination of Father's parental rights; however, she is a necessary party to Stepfather's petition for adoption. *See* Tenn. Code Ann. § 36-1-115(c) (noting that the spouse of the petitioner seeking to adopt a child must sign the adoption petition as a co-petitioner even when the spouse is the biological parent of the child sought to be adopted); *Osborn v. Marr*, 127 S.W.3d 737, 740-41 (Tenn. 2004) (explaining that a parent of a child is not one of the persons or entities with standing to file a petition to terminate parental rights).

[2] The witnesses' testimony will be discussed as it relates to the issues on appeal.

2

(1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996).  While this right is fundamental, it is not absolute.  The State may interfere with parental rights in certain circumstances.  *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g).  Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists.  *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest.  Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted).  Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Appellate courts review the trial court's findings of fact in termination proceedings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246.  Due to the heightened burden of proof in termination proceedings, "the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97.

A.     Stepfather's Standing to File an Adoption Petition

Father cites Tenn. Code Ann. § 36-1-115 in support of his assertion that Stepfather was not an "actual resident" of the State of Tennessee at the time he filed the petition to terminate Father's parental rights and to adopt the children; thus, Father argues, Stepfather lacked standing to file the petition.

Both termination of parental rights and adoptions are governed exclusively by statute

in Tennessee. *In re Shelby L. B.*, No. M2010-00879-COA-R9-PT, 2011 WL 1225567, at *5 (Tenn. Ct. App. Mar. 31, 2011). Tennessee Code Annotated section 36-1-115, entitled "Persons eligible to file adoption petition; residence requirements; preference for foster parents," states the following regarding residency requirements:

> (d) The petitioner or petitioners shall have lived, or maintained a regular place of abode, in this state or on federal territory within the boundaries of this state for six (6) consecutive months immediately preceding the filing of the adoption petition.
> . . .
> (f) Where the petitioner is seeking to adopt a child that is related, the residency requirement in subsections (d) and (e) shall not apply if the petitioner is an actual resident of this state at the time the petition is filed.

Father correctly points out that subsection (f) is the relevant portion of the statute because Step-father is "related" to the children. *See* Tenn. Code Ann. § 36-1-102(42) ("'Related' means grandparents or any degree of great-grandparents, aunts or uncles, or any degree of great-aunts or great-uncles, *or step-parent . . .*") (emphasis added). Therefore, Stepfather must have been an "actual resident" of Tennessee on November 14, 2013, the date the petition was filed, in order to have standing under this statute.

Stepfather testified that in October 2013, he rented a three-bedroom trailer on Summertown Highway for himself, Mother, and the children to live in. Stepfather stated that the family resided there for approximately seven months. He explained that he worked as a farrier, shoeing horses, in Florida. He described his work schedule during the seven months that the family lived at the Summertown Highway location as follows:

> Q. And during that period of time were you still going back and forth to Florida at all?
> A. Yes, I still have work and my work travels, and so I would go back and forth and do my job and come back and stay here.
> Q. Were you still doing the 2 week schedule?
> A. No, I was able to stay longer at that time. I had condensed my schedule and got things to where I could stay a little bit longer, like 2 to 2 and a half weeks.

Stepfather stayed with his mother or in a hotel when he went to work in Florida. Mother corroborated Stepfather's testimony and verified that the family lived in the trailer on Summertown Highway in November 2013 and considered it home.

4

Although we have been unable to find a statutory definition for the term "actual resident" or caselaw interpreting the phrase, Stepfather and Mother testified that Stepfather resided in Tennessee in November 2013. Even though Stepfather had some work obligations in Florida, he did not have a permanent residence in Florida. To the contrary, he always returned to the trailer in Tennessee that he rented with his family when he was working out of state. Therefore, we affirm the trial court's holding that Stepfather was an actual resident of Tennessee in November 2013, as required by the applicable statute, and had standing to file the petition for adoption.

### B. Grounds for Termination: Abandonment

A court may terminate parental rights when "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A)(iv) defines abandonment as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

The trial court found clear and convincing evidence that Father abandoned the children by willfully failing to visit and support them in the four consecutive months preceding his incarceration and that Father engaged in conduct prior to his incarceration that exhibited a wanton disregard for their welfare. Father was incarcerated for violation of parole on May 20, 2013 and was still incarcerated on November 14, 2013, when the petition was filed. Thus, the relevant time period for purposes of abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(iv) is the four months preceding his incarceration: January 19, 2013 through May 19, 2013.

#### i. Willful Failure to Visit

We begin our analysis with the ground of abandonment for failure to visit. Father challenges the trial court's determination that he abandoned the children by willfully failing to visit them during the relevant four-month time period. The trial court made the following relevant findings regarding Father's visitation with the children:

The testimony at trial showed that Father failed to regularly visit his children. Mother testified that Father visited with the children sporadically. Father's own testimony was that he visited with his children on the weekends sporadically. He admitted he did not have a good relationship with his children and that they do not call him "dad" because he "has not been there" for them. Most significantly, Father failed to visit with his children regularly because his own criminal conduct continuously landed him in jail. He testified at the trial that he has been in and out of jail during the children's lifetime.

. . . Father's visitation with the children was of such an infrequent nature and of such short duration as to merely establish minimal or insubstantial contact with the children.

In support of its holding, the trial court cited *In re Keri C.*, 384 S.W.3d 731 (Tenn. Ct. App. 2010), to support its reasoning that Father's visitation with the children was merely "token" visitation.

"Willfulness" is a critical element of the definition of abandonment. In this context, "willful" means that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see In re Audrey S.*, 182 S.W.3d at 863-64 (holding that an individual acts willfully if he or she knows what he or she is doing and has the intention to do what he or she is doing). Tennessee Code Annotated section 36-1-102(1)(E) defines "willfully failed to visit" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tennessee Code Annotated section 36-1-102(1)(C) defines "token visitation" as visitation that is "nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Whether visitation should be characterized as "token" pursuant to this definition is a "fact-intensive inquiry to be decided on a case-by-case basis." *In re Keri C.*, 384 S.W.3d at 748.

In *In re Keri C.*, this Court considered whether the evidence supported the trial court's finding that a mother's visits with her child were merely "token." *Id.* The mother in *In re Keri C.* visited the child at roughly one-month intervals, in a large group setting with other children present. *Id.* at 750. The visitation sessions lasted approximately thirty minutes each. *Id.* Further evidence was introduced that the mother phoned the child "once or twice" during the relevant time period. *Id.* at 739. This Court determined that, under those circumstances, the visits were "insufficient to result in any substantial relationship or bond" and "cannot be viewed as a reasonable attempt to forge a meaningful relationship with the child." *Id.* at 750-

51. Thus, the *Keri C.* Court found that the record contained clear and convincing evidence to support the trial court's conclusion that the mother engaged in token visitation.

Here, the evidence is undisputed that Father visited the children during the relevant four-month time period. Mother testified that the last time Father visited the children was overnight on a weekend in February 2013. The parties apparently engaged in a dispute in February 2013 causing enmity between them and resulting in a disruption in Father's visitation with the children. On cross-examination, Mother was asked to discuss a harassment charge she filed against Father. The Affidavit of Complaint, which was entered into evidence and signed by Mother, states that:

> On or about <u>February through April</u> in Lewis County, Tennessee, <u>Brandon W.</u> committed the offense(s) of violation(s) of T.C.A. § <u>[39-17-308] Harassment</u> . . . I further state under oath that the essential facts constituting the offense(s), the sources of my information and the reasons why this information is believable and reliable are as follows: <u>Brandon W. and Angela H. have 2 children. Both children w[ere] born out of wedlock. Brandon has called Angela numerous times over the past couple of months cursing, using foul language saying he wants visits with his children. Brandon has been advised the proper court proceedings for visitations. Brandon's calls are annoying and alarming to Angela.</u>[3]

Father testified that he visited the children on the weekends prior to the dispute between the parties in February 2013. Father testified that on April 18, 2013, he filed a petition for visitation in the juvenile court seeking to gain visitation with the children. There was no previously entered court-ordered child support order or visitation schedule for Father.

Our review of the evidence leads us to conclude that the trial court erred in its determination that the evidence was clear and convincing that Father abandoned the children by willfully failing to visit them. Father did visit the children during the four months preceding his incarceration and apparently sought to continue visitation following his altercation with Mother. The overnight weekend visitation he had with the children prior to February 2013 is more substantial than the thirty-minute visits of the mother in *In re Keri C.* We find that Father's visitation with the children, prior to February 2013, constituted more than mere "token" visitation. Moreover, Father sought to continue seeing the children and filed a petition for visitation in the juvenile court during the four months preceding his incarceration and continually called Mother in an effort to see the children, to the point that

---

[3] The underlined portions of the quote are the sections of the Affidavit that were filled out by the officer who took Mother's statement. Mother signed the Affidavit under oath.

Mother filed harassment charges against him. Therefore, we modify the trial court's judgment to reverse the trial court's finding of abandonment by willful failure to visit.

Only one of the statutory grounds need be proven by clear and convincing evidence for a parent's rights to be terminated. *See In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). Therefore, we continue our analysis by examining the ground of abandonment based on failure to support.

### ii. Failure to Support

Father asserts the evidence preponderates against the trial court's findings that he failed to support the children pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(iv). With respect to failure to support, the trial court stated:

> Furthermore, the testimony at the trial was that Father failed to support his children during their entire lifetimes. During the lifetime of the children, Father was in and out of jail because of his continuous drug abuse and other violations of the law. When he was not incarcerated, Father worked only sporadically. On one occasion, he even failed to use the proceeds of his tax return to repair the water heater in the home in which the children were living. Also, according to Mother, Father purchased only one pack of diapers for their youngest child.

We have reviewed the trial court's findings and the evidence presented at trial and find that the evidence preponderates against the trial court's findings regarding Father's failure to support the children in the four months preceding his incarceration. The evidence is undisputed that Father did provide monetary support for the children during the relevant time period. Both Mother and Father agreed that the last time Father provided support for the children was in February 2013. Specifically, Mother testified that Father gave her and the children $1,300 from his income tax return in February 2013.[4] Mother also testified that she asked Father to use a portion of his remaining income tax check to bail her brother out of jail. She testified regarding this request as follows:

> Q. But you did testify earlier that he did spend some of that money to get your

---

[4] Mother was questioned about Father's payment of support from February until May of 2013 as follows:

> Q. From February until May of that year, how much child support did he pay you?
> A. He gave me enough money to - - all the money he gave me was $1,300.

brother out of jail?
A. Yes.
Q. Why did he do that?
A. Because I asked him to.
Q. How much was that?
A. I think it was 1,200.
Q. Would that not have been better spent on the children?
A. My brother was paying it back.

The trial court stated that, "Father failed to support his children during their entire lifetimes." However, Mother testified that when Father was working at an out-of-town job he "gave me $50 a week a few times" and that when Mother and Father were living together at various points in their relationship, Father would "buy food for the kids" and "help with the bills."

Based on this evidence, we have concluded that the record does not support the trial court's determination that Mother and Stepfather proved by clear and convincing evidence that Father abandoned the children by failing to support them during the relevant time period. Father's payment of $1,300 to Mother during the four months preceding incarceration was more than a "token" amount, given his means.[5] *See* Tenn. Code Ann. § 36-1-102(1)(B) (defining "token support" as support that is "insignificant given the parent's means"). Therefore, we modify the trial court's judgment to reverse the trial court's findings in this regard.

### iii. Wanton Disregard

Finally, we consider whether the trial court erred in finding Father's rights should be terminated based on a finding that he engaged in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare. "[P]arental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration." *State of Tenn. Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009); *see also In re B.P.C.*, No. M2006-02084-COA-R3-PT, 2007 WL 1159199, at *9 (Tenn. Ct. App. Apr. 18, 2007) ("no specified time frame limits which pre-incarceration acts or omissions are subject to review" when determining whether the parent engaged in wanton disregard for child's welfare); *In re Audrey S.*, 182 S.W.3d at 871. Although Tenn. Code Ann. § 36-1-102(1)(A)(iv) does not specifically define "wanton

---

[5] Although there was not extensive testimony regarding Father's "means" at the time he gave Mother $1,300, the record indicates that he did not have full-time employment at that time and that he was living with his mother.

9

disregard," Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68; *see also In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse."). Simply stated, "a parent's poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children." *Hood*, 338 S.W.3d at 926.

With regard to Father's conduct exhibiting a wanton disregard for the children, the trial court found as follows:

> The undisputed testimony at trial was that Father is a serious drug addict. He has lived a life of crime and has been in and out of jail for theft offenses, drug offenses, and probation or parole violations during the entire lifetime of the children. Indeed, Mother bailed him out of jail two weeks before their first child was due so that he could be present for the birth; however, he was back in jail before the baby was even born. Father has been incarcerated for all but a few months of the lifetime of their second child. Other testimony regarding Father's conduct was that he was "high" or under the influence of drugs in the presence of the children, including during a trip to take one of the children to the dentist, and that he "shot up" drugs with friends and his brother during the lifetime of the children. Father's own testimony was that he chose a life of drugs and crime over his children.

We have reviewed the trial court's findings and hold that the evidence clearly and convincingly supports the trial court's determination regarding Father's wanton disregard for the children. Father admitted that he was a drug addict, that he "shot up Morphine" and that he abused prescription drugs. Most indicative of his wanton disregard for the children is Father's admission to being "high" in the presence of the children. Mother testified that he "came home high" on multiple occasions throughout the children's lifetimes and that she made him sleep out in the car when he was high. A review of his criminal history since his oldest daughter was born in May 2008 reveals probation violations for driving on a revoked license and charges for harassment, public intoxication, theft of property, leaving the scene of an accident/property damage, burglary of an automobile, and possession of unlawful drug paraphernalia. *See In re Audrey S.*, 182 S.W.3d at 867-68 (explaining that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child" may constitute conduct that exhibits a wanton disregard for a child). Father responded "yes, sir" when he was asked whether he "chose to be a criminal instead of a father[.]" We affirm the trial court's determination that

Father engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the children, which constitutes a ground for terminating Father's parental rights.

## C. Best Interests

As explained above, the trial court properly found the existence of one statutory ground for terminating Father's rights to the children. *See In re D.L.B.*, 118 S.W.3d at 367 (noting that only one statutory ground is required to justify termination of parental rights). The next step in our analysis is to determine whether the trial court correctly held that terminating Father's rights is in the best interests of the children. Tennessee Code Annotated section 36-1-113(i) sets forth the following non-exclusive list of factors relevant to determining whether termination of a parent's rights is in a child's best interest:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to

11

§ 36-5-101.

The best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d at 878. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d).

In this case, the court dutifully examined each of Tenn. Code Ann. § 36-1-113(i)'s factors and found that each factor weighed in favor of terminating Father's parental rights. We have reviewed the evidence and agree with the trial court. Sadly, Father has been unable to overcome his addiction to drugs and has abused drugs while in the presence of his children—these choices have left Father unable to care for the children in a safe and stable manner. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (7). Furthermore, Father has repeatedly engaged in criminal behavior leading to his incarceration throughout the children's lives which has made it difficult for him to maintain a meaningful and consistent relationship with the children, especially his younger daughter. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). In light of Father's substance abuse, criminal history, and repeated incarcerations, we affirm the trial court's determination that the termination of Father's rights is in the children's best interests.

CONCLUSION

We modify the trial court's findings regarding abandonment by failure to visit and support, but affirm the judgment of the trial court in all other respects. Costs of appeal are assessed against the appellant, Brandon W., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE